1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
2

3    SUSAN M. MILES,

4     Plaintiff,                    Docket No. 17-2685

5     v.

6    UNIFIED SCHOOL DISTRICT         Kansas City, Kansas
     No. 500, KANSAS CITY,           Date:  3/27/2019
7    KANSAS, ET AL.,

8     Defendants.

9
     ..........................
10
             PARTIAL TRANSCRIPT EXCERPT OF BENCH TRIAL
11     TESTIMONY OF SUSAN M. MILES AND ROBERT P. TURNER

12        BEFORE THE HONORABLE DANIEL D. CRABTREE
             UNITED STATES DISTRICT COURT JUDGE
13
     APPEARANCES:
14
     For the              Michael Stipetich
15   Plaintiff:           Smith Mohlman Injury Law, LLC
                          4600 Madison Avenue
16                        Suite 711
                          Kansas City, MO 64112
17

18   For the              Byron A. Bowles, Jr.
     Defendants:          Gregory P. Goheen
19                        McAnany, Van Cleave & Phillips
                          10 E. Cambridge Circle Drive
20                        Suite 300
                          Kansas City, KS 66103
21

22

23      Proceedings recorded by machine shorthand, transcript
     produced by computer-aided transcription.
24   _____

25

```
1                           I N D E X

2

     Plaintiff's Witnesses:                              Page
3
     SUSAN M. MILES
4      Direct Examination By Mr. Stipetich                  3
       Cross Examination By Mr. Bowles                      32
5      Redirect Examination By Mr. Stipetich               52

6    ROBERT P. TURNER
       Direct Examination By Mr. Stipetich                 58
7      Cross Examination By Mr. Bowles                      66

8

9
                        E X H I B I T S
10
       Plaintiff's
11     Exhibits              Offered          Received

12         2                   63                63
           5                   61                61
13         8                   25                25
           9                   25                25
14        11                   51                51
          23                   12                12
15        26                   10                10
          29                   21                21
16
       Defendant's
17     Exhibits              Offered          Received

18       102                   66                66
         105                   68                69
19

20

21

22

23

24

25
```

```
 1                 (Excerpt of bench trial.)
 2                      SUSAN M. MILES,
 3   called as a witness on behalf of the Plaintiff, having
 4   first been duly sworn, testified as follows:
 5           THE COURT:  Please be seated.  And then if you
 6   will just adjust the chair and the microphone so it will
 7   amplify your voice.  Then can I ask you to say your name
 8   for the record.
 9           THE WITNESS:  Susan M. Miles.
10           THE COURT:  You may need to move a little closer.
11   Thank you very much.
12           Mr. Stipetich, you may proceed.
13                    DIRECT EXAMINATION
14   BY MR. STIPETICH:
15     Q.  Ms. Miles, Defense's Exhibit 103, the Separation
16   and Release Agreement --
17           MR. STIPETICH:  I'm sorry, judge, could you --
18   pardon me.  I left my exhibit.
19           MR. BOWLES:  One for the witness.  If you want to
20   use that, it's got 103 in it.  Sorry hadn't put it up
21   there yet.
22           THE COURT:  Sure.
23           MR. GOHEEN:  Your Honor, we got one copy the
24   witness can have too if you want to just use the
25   notebooks.
```

1       MR. STIPETICH:  That's fine.

2       MR. GOHEEN:  Sure.

3       THE COURT:  If you want to just leave that up

4  there, that's fine.  They're not in evidence until

5  they're shown as in evidence.  But to save you -- it's

6  your direct examination, I won't try to steer it.

7       MR. STIPETICH:  Okay.

8  BY MR. STIPETICH:

9    Q.  Ms. Miles, I'm going to show you what's been

10  marked Exhibit 103.  And would you, please, tell the

11  court what is this document?

12    A.  It's a Mutual Release and Separation Agreement.

13    Q.  And if you look at the -- the first paragraph on

14  page 1, who are the parties between which the agreement

15  was made?

16    A.  Employee and -- I'm sorry, I don't -- I --

17    Q.  Maybe this will help.

18    A.  I see it, okay.  Okay.  I see where you're

19  saying.  Susan Miles, employee, and Unified School

20  District 500, Wyandotte County, Kansas.

21    Q.  And do you see Valerie Castillo's name in that

22  paragraph?

23    A.  No.

24    Q.  If you look at the last page of Exhibit 103,

25  which is page 4, is that your signature that appears at

1   the top of the page?

2       A.  Yes.

3           THE COURT:  I'm sorry, I didn't hear your answer.

4           THE WITNESS:  Yes.

5           THE COURT:  Thank you.

6   BY MR. STIPETICH:

7       Q.  So you did sign this document?

8       A.  Yes.

9       Q.  And if you look at page 1 of Exhibit 103, the

10  third paragraph down, it started here where it states,

11  "Employee shall separate from the employment by

12  submitting a written resignation to the employer."  Do

13  you see that?

14      A.  Yes.

15      Q.  Did you resign your employment with the school

16  district?

17      A.  No.

18      Q.  You did not voluntarily resign your employment

19  with the school district; is that correct?

20      A.  No.

21      Q.  Were you terminated by the school district?

22      A.  Yes.

23      Q.  Who notified you that -- that -- did someone

24  notify you that your employment with the school district

25  would end?

 1    A.   Yes.

 2    Q.   And who was that person?

 3    A.   Robert Turner, IV.

 4         MR. STIPETICH:   And the record reflect plaintiff

 5    has identified defendants' counsel, Rob Turner.

 6    BY MR. STIPETICH:

 7    Q.   When did that conversation occur?

 8    A.   It was, to the best of my recollection, January

 9    4th.

10    Q.   Was it a phone call or an in-person?

11    A.   It was by phone.

12    Q.   And are you sure of the date?

13    A.   Not entirely.

14    Q.   Could it have been January 3rd?

15    A.   It could have been.

16    Q.   If you would, please, state the substance of that

17    conversation, meaning what did you say and what did

18    Mr. Turner say.

19    A.   Mr. Turner phoned me and told me that I was being

20    terminated, that I was not allowed back on school

21    property.   My memory's very hazy.

22    Q.   Did Mr. Turner tell you why, as you say, you were

23    being terminated?

24    A.   It's because I missed the deadline of repayment

25    to the school district.

17-2685  Miles v USD 500, et al  3.27.19  _Excerpt

1    Q.   Repayment of what?

2    A.   Wages that were paid in error during the

3  beginning of the school year in August and September of

4  2016.

5    Q.   Had you, at this time as of January 3rd or 4th,

6  2017, secured funds to repay these allegedly overpaid

7  wages?

8    A.   Yes.

9    Q.   And how did you secure those funds?

10   A.   We had taken a loan out against my husband's 401k

11  at his employment.  And it took 30 days to process, so

12  that the funds came in one business day late.

13   Q.   So when did you apply for the loan then?

14   A.   It was in late November.  I'm -- if I'm

15  remembering correctly, it was somewhere around November

16  27th, 28th, somewhere in that vicinity.

17   Q.   And had you notified the school district prior to

18  January 3rd, 2017 that you had -- that you were in the

19  process of securing a loan to repay the overpayment of

20  wages?

21   A.   My workers' comp lawyer, Katy Cossairt, was --

22  was trying to -- to help me with that and she notified

23  the school district that the funds were coming, that we

24  had secured a loan for the repayment and we were just

25  waiting for the funds to transmit.

1         MR. BOWLES:  Your Honor, I suppose delayed a bit.

2    Object as to hearsay.

3         THE COURT:  Overruled.

4    BY MR. STIPETICH:

5    Q.   Ms. Miles, you mentioned that you were

6    represented by an attorney.  Was it your understanding

7    that your attorney represented you only in your workers'

8    compensation case?

9    A.   The whole situation to me is confusing, but my

10   understanding was that she was my workers' compensation

11   lawyer.  However, she -- she did contact the district on

12   my behalf several times.

13   Q.   Back to your phone call with Mr. Turner, did you

14   explain to him, as you said, why the funds were late?

15   A.   I -- I remember asking him to call the district

16   and ask them to reconsider because it was only a day

17   late.  And the deadline that they had given me was

18   impossible to attain for anyone because it was a

19   Saturday and it was on a holiday weekend, and the funds

20   became available the next business day.

21   Q.   When you say the deadline they had given you,

22   what was the deadline the school district had given you

23   to repay the funds?

24   A.   December 30th, 2017 -- 2016, I'm sorry.

25   Q.   And prior to December 30th, 2016, had you been

1  working with the school district towards a plan to repay

2  those wages?

3      A.   Mr. Greenbaum and Ms. Cossairt had been

4  negotiating and hashing out some -- a plan.

5      Q.   I just want to talk about the wage overpayment

6  issue.  When did you first realize that something wasn't

7  right with -- with the manner in which you were being

8  paid by the school district?

9      A.   On August 15th I received my full paycheck.  When

10  I found it in my account, I immediately called the

11  school and said, "I have been paid.  What is this money

12  for?"

13      I was transferred around to several people who --

14  I finally ended up with one person who said, "It's your

15  salary," and "we're self-insured.  It's your money."

16  And so I went on and used it to pay bills and living

17  expenses.

18      It happened again on August 30th, September 15th,

19  September 30th and October 15th.  And I called -- I

20  called my lawyer first and then I called the school

21  district every time except October 15th because I had

22  been told the same thing four times before.  So I assume

23  that the 15th of October was the same situation.

24      Q.   Ms. Miles, I'm going to show you what's been

25  marked Exhibit 26.  Would you describe this document?

1     A.   It is an e-mail from me to JaNia Motley with a

2   carbon copy to Katy Cossairt.

3     Q.   And what is the date of this e-mail?

4     A.   The date is August 25th.

5     Q.   2016?

6     A.   2016.  Yes, I'm sorry.

7     Q.   And the second sentence of the e-mail states, "I

8   received a paycheck for a pay period August 1 to 15."

9          THE COURT:  Let me stop you there.  Are you

10  talking about Exhibit 1?

11         MR. STIPETICH:  I'm sorry.  I previously marked

12  it Exhibit 26.

13         THE COURT:  26.  I just didn't hear it.  You want

14  to offer Exhibit 26 at this time?

15         MR. STIPETICH:  Yes, judge.

16         THE COURT:  There's an offer of Exhibit 26.  Any

17  objection to it?

18         MR. BOWLES:  No objection.

19         THE COURT:  It's received.

20  BY MR. STIPETICH:

21    Q.   And, Ms. Miles, you were earlier discussing

22  contacting the school district around some time in the

23  mid to late August I believe.  Is this the communication

24  you were referring to?

25    A.   I made phone calls first and then I e-mailed

1    JaNia.

2        Q.  Ms. Miles, did you inform your workers'

3    compensation attorney, Ms. Cossairt, about the problems

4    with your -- your paycheck in August of 2016?

5        A.  Yes.

6        Q.  And did she indicate to you that she would

7    attempt to rectify that issue on your behalf?

8            MR. BOWLES:  Objection.  Hearsay.

9            THE COURT:  It does ask for an out-of-court

10   statement, Mr. Stipetich.  It sounds like hearsay.  Is

11   there some reason it's admissible?

12           MR. STIPETICH:  No.

13           THE COURT:  Then I'll sustain the objection.

14   BY MR. STIPETICH:

15       Q.  Ms. Miles, I'm going to show you what has

16   previously been marked Exhibit 23.  What is this

17   document?

18       A.  It is an e-mail from Ms. Cossairt to me dated

19   August 23rd, 2016.

20       Q.  And if you look at the bottom of the first

21   page of Exhibit 23, it looks like there's one e-mail

22   from you to Ms. Cossairt on August 23rd, 2016; is that

23   correct?

24       A.  Yes.

25       Q.  And if you look at the second page, do you see

 1   where it says, "Hi, Katy.  I've called and left messages

 2   but I haven't heard anything back yet."  Is that

 3   referencing your communications to the school district

 4   about the wage overpayment?

 5       A.   Yes.

 6            MR. STIPETICH:   Judge, we'd move to admit

 7   Exhibit 23.

 8            THE COURT:   There's an offer of Exhibit 23.

 9            MR. BOWLES:   No objection.

10            THE COURT:   It's received.

11   BY MR. STIPETICH:

12       Q.   Ms. Miles, do you recall receiving a letter in

13   October of 2016 from Fred Greenbaum representing the

14   school district?

15       A.   Yes.

16       Q.   And what was the nature of that letter?

17       A.   The letter was to inform me that I had been

18   overpaid and that I owed the school district 9,000 --

19   over $9,000 -- almost $10,000, and that payment was

20   demanded, otherwise legal action and prosecution would

21   be turned over to the prosecutor's office I have not

22   paid.

23       Q.   And, Ms. Miles, if you would look at exhibit --

24   I'm sorry, Exhibit 25.  Is this the letter that you were

25   just referring to?

1     A.   I don't know.  I'm sorry, I was mistaken.  I was

2   referring to the second letter I received.  This is the

3   first letter that I received from Mr. Greenbaum.

4     Q.   And at the top here it states the letter was

5   e-mailed to Ms. Cossairt, your attorney; is that

6   correct?

7     A.   Correct.

8     Q.   Did Ms. Cossairt forward you the letter?

9     A.   I don't recall if she forwarded it to me or if

10  she talked to me about it.  It seems to me she forwarded

11  it to me.

12    Q.   You do recall seeing this letter on or around

13  October 26th, 2016; is that right?

14    A.   Yes.

15    Q.   And if you look at the second to the last

16  sentence here it states, "We will need to receive credit

17  for the payments if and when we resolve this matter."

18    A.   Right.

19    Q.   What did you understand that to mean?

20    A.   That I had to pay back the money that they

21  erroneously paid me from August to September 30th, from

22  August 15th to September 30th.

23    Q.   And if you look at the subject line here, which

24  states, "Susan M. Miles versus USD 500, et cetera."

25  What case does that refer to?

1     A.   My workers' compensation case.

2     Q.   Was it your understanding that the pay back of

3  the funds then would be part of your -- the workers'

4  compensation case's resolution?

5     A.   Yes.

6     Q.   Going back to January of 2017, you testified

7  earlier that you did sign Exhibit 103, which is the

8  Mutual Release and Separation Agreement?

9     A.   Correct.

10    Q.   Was that the first agreement that you were

11  presented with by the school district?

12    A.   No.

13    Q.   When were you first presented with another

14  agreement?

15    A.   It was after Mr. Turner contacted me about the

16  termination of my contract.

17    Q.   Which would have been?

18    A.   January -- January 3rd or 4th it would have been.

19    Q.   Are you sure about the date?

20    A.   Not entirely.

21    Q.   And where were you presented with the agreement?

22    A.   At the law offices of MVP.

23    Q.   And you're referring to McAnany, Van Cleave &

24  Phillips; is that correct?

25    A.   Yes.

1    Q.   And, I'm sorry, who did you say presented the

2    agreement to you?

3    A.   Mr. Turner.

4    Q.   And where did you meet Mr. Turner?

5    A.   I met him at the MVP law office.

6    Q.   I'm sorry --

7    A.   Prior to that I had only spoken to him on the

8    phone.

9    Q.   I'm sorry, where in the law office did you meet

10   him?

11   A.   In the conference room that was right near the

12   receptionist desk.

13   Q.   And would you, please, tell the court the

14   substance of your conversation with Mr. Turner in the

15   conference room.

16   A.   Mr. Turner explained that this is just a standard

17   separation agreement.  It's typical of all the

18   separation agreements that are used in this particular

19   situation.  There's -- it's just a standard form that I

20   needed to sign.  And then I was left in the conference

21   room to read it and -- and then sign it.

22        I got halfway through signing my first name and I

23   stopped.  I didn't feel comfortable signing it.  It felt

24   wrong.  And so I told Mr. Turner that I didn't feel

25   comfortable signing it, and he suggested that I take it

1    to my attorney, Ms. Cossairt.

2       Q.  And when you say "you started to sign it," was

3    Mr. Turner in the room then?

4       A.  No.

5       Q.  Did you attempt to read the agreement before

6    signing it?

7       A.  I tried to.

8       Q.  When you say "tried to," what do you mean?

9       A.  I had difficulty reading it.  I have a torn

10   muscle in my eye and I have difficulty reading fine

11   print.  I was distraught over losing my job.  I was

12   confused.  I tried my best but I just couldn't -- I

13   couldn't grasp what was being said in it and everything.

14   I'm not an attorney, so I don't know all of the legalese

15   that was in there.

16      Q.  When you say you had "difficulty reading fine

17   print," was the agreement in fine print?

18      A.  I guess "fine print" is a relative term.  But at

19   the point I was at, recovering from a traumatic brain

20   injury, suffering from post-concussion syndrome and a

21   torn muscle in my right eye, reading was extremely

22   difficult for me and it -- I was not able to read it

23   without having a rush of pressure come through my head.

24   And I'd have to periodically stop and then start reading

25   again.  It was difficult for me to read at best.

 1      Q.  Ms. Miles, had you -- had you been examined by a

 2  doctor with regard to your vision problems?

 3      A.    Yes.  I saw Dr. Patan [phonetic].  I also saw

 4  Dr. Joseph Noland.  Dr. Noland is who I went to first

 5  after I was having problems at school being able to read

 6  -- read and write on the board and read books and that

 7  kind of thing.  He diagnosed me with a traumatic brain

 8  injury.

 9          MR. BOWLES:  Your Honor, I'm going to object to

10  introducing medical diagnosis from the stand for lack of

11  foundation, hearsay.  There are no medical experts

12  identified as witnesses in this case.

13          THE COURT:  Mr. Stipetich, it does sound like

14  she's getting ready to testify.  May have, to a certain

15  extent, already testified about what the doctor said to

16  her, which, of course, sounds like hearsay to me.

17          MR. STIPETICH:  Right.

18          THE COURT:  And so is there any exception that

19  would save the question from the hearsay objection?

20          MR. STIPETICH:  Yes, judge.  We have an exhibit,

21  Exhibit 32.  I believe the business records exception

22  would apply.  It is his record of her examination by an

23  ophthalmologist.

24          THE COURT:  Well, certainly if you offer that

25  objection, we may get to the point we're talking its

1   bona fides, to use an evidentiary term.  But to the

2   question you put to the witness, I'm going to sustain

3   the objection at this time.

4   BY MR. STIPETICH:

5      Q.  Ms. Miles, you were discussing your conversation

6   with Mr. Turner after you attempted to sign the

7   agreement.  Did Mr. Turner advise you that you had a

8   right to seek legal counsel when he initially met with

9   you in the conference room?

10     A.  No.

11     Q.  And when he left the room, do you know where he

12  went?

13     A.  No.

14     Q.  And when Mr. Turner mentioned that you should

15  take the agreement to your attorney, did you do so?

16     A.  Yes.

17     Q.  And what attorney was that?

18     A.  Ms. Cossairt, Katy Cossairt.

19     Q.  And did you meet with Ms. Cossairt that day?

20     A.  Yes.

21     Q.  And did she look at the agreement?

22     A.  She did, very briefly.

23     Q.  About how long?

24     A.  Maybe five minutes.

25     Q.  Did she say anything about it?

1    A.  She thumbed through it looking to make sure that

2  there was nothing that would affect my workers' comp

3  case.  And then she advised me to have them enter

4  something about a clause about not denying workers'

5  compensation benefits.

6    Q.  At this time did you know whether or not you

7  signing that initial agreement would prevent you from

8  continuing to pursue your workers' compensation claims

9  against the school district?

10   A.  I'm sorry, could you restate the question?

11   Q.  At this time Ms. Cossairt reviewed that initial

12  agreement, did you know whether or not that agreement

13  would prevent you from continuing to pursue --

14   A.  No --

15   Q.  -- if you...

16   A.  -- not --

17   Q.  Okay.  And did Ms. Cossairt say anything else to

18  you?

19   A.  Not that I can recall.

20   Q.  And then what did you do after your meeting with

21  Ms. Cossairt with that agreement?

22   A.  I contacted Mr. Turner and told him that I needed

23  a clause regarding not denying unemployment benefits.

24        THE COURT:  You said unemployment benefits?

25        THE WITNESS:  Yes.

1  BY MR. STIPETICH:

2     Q.  I'm sorry, what did you do physically with the

3  agreement?

4     A.  The agreement was taken back to the -- the law

5  firm to Mr. Turner and he kept that copy and then -- and

6  then a revised copy was made with the -- an unemployment

7  benefit clause added.

8     Q.  So did you return to McAnany, Van Cleave &

9  Phillips to sign the revised agreement?

10    A.  I returned to -- to McAnany, yes, to sign the

11  agreement and have it notarized, had my signature

12  notarized.

13    Q.  Okay.  Who did you meet with the second time,

14  your second visit to the law firm?

15    A.  Mr. Turner.

16    Q.  And where did you meet with him that time?

17    A.  In the conference room just right outside the

18  secretary's-receptionist's area.

19    Q.  And what was the substance of that conversation

20  with Mr. Turner?

21    A.  I -- I just -- I signed the agreement.  I at one

22  point, I'm not sure if it was the first time or the

23  second time, I told him I had to trust what he said

24  because I didn't really feel like Katy spent any time

25  going over it and I didn't have -- I wasn't comfortable

1   with it but I didn't have any choice.

2     Q.  Is there any written document you believe would

3   better assist you in recalling the details of the

4   conversation on January 9th, 2017?

5     A.  There might be an e-mail.  I'm not a hundred

6   percent sure.

7     Q.  Did you complete an affidavit in this case?

8     A.  In the mutual separation?

9     Q.  I'm sorry, in this case?

10    A.  Yes.

11    Q.  And does that affidavit discuss the details of

12  your meeting on January 9th, 2017 --

13    A.  Yes.

14    Q.  -- with Mr. Turner?

15        THE COURT:  Is this Exhibit 29?

16        MR. STIPETICH:  Yes.

17        THE COURT:  Do you wish to offer Exhibit 29 at

18  this time?

19        MR. STIPETICH:  Yes, judge.

20        THE COURT:  Is there objection to 29?

21        MR. BOWLES:  No objection.

22        THE COURT:  It's received.

23  BY MR. STIPETICH:

24    Q.  Ms. Miles, I think here on page 4 of Exhibit 29,

25  paragraph 16 --

1      A.   That is correct.

2      Q.   -- where it says, "Mr. Turner made small-talk and

3   stated that he 'felt bad' that I did not have good legal

4   representation and on this matter."

5      A.   Yes.

6      Q.   Mr. Turner stated that to you?

7      A.   Yes.

8      Q.   And one other on page 3 of Exhibit 29, you also

9   discuss the phone call with Mr. Turner.  It states that

10   it's on January 3rd, 2017.  Does that refresh your

11   recollection as to when that phone call occurred?

12      A.   Yes.

13      Q.   And if you go to the top of the next page it

14   states here that Mr. Turner advised you that you must

15   sign the agreement and accept a resignation in order to

16   not be terminated and have criminal charges filed

17   against you?

18      A.   Yes, that is correct.

19      Q.   Did -- just to clarify the record:  Did

20   Mr. Turner state that criminal charges could be filed

21   against you or that they would be filed against you?

22      A.   They would be filed against me.

23      Q.   And did you eventually make a payment for the

24   allegedly overdue wages to the school district?

25      A.   Yes.

1    Q.  And how much was your payment for?

2    A.  It was 9,600 -- and I don't remember the exact

3  amount but it was over $9,600 that was taken -- I took a

4  cashier's check down.

5    Q.  And do you recall when you made that payment?

6    A.  This is going back three years.  It's hard for me

7  to remember exactly.

8    Q.  Do you recall who you made the payment to?

9    A.  I gave the check to Mr. Turner.

10    Q.  Was it in one of those two meetings that you just

11  testified about?

12    A.  Yes.

13    Q.  Do you remember which meeting it was?

14    A.  I do not remember which one.  It seems to me like

15  it was the 2nd one I had to turn in my Mac -- my MacBook

16  and my -- my district ID also, and I believe it was at

17  that time.

18    Q.  And did you ever receive any portion of those

19  funds back from the school district?

20    A.  Yes.  When I was cleaning out my classroom, it

21  was approximately a week later, it was on a Wednesday

22  afternoon, I wasn't allowed in the building until after

23  four o'clock.  My husband and I packed up most of the

24  things that were in my room that belonged to me.  Some

25  things were notably missing, my ladder.  My supply

1   caddies were being used by the kids, so I just -- I left

2   those.  And as we were finally leaving, Amy Jo Troyer

3   handed me a check for roughly $3,000 that said that --

4   she said that they miscalculated and it was an

5   overpayment.

6       Q.  Did you ever receive a written explanation from

7   the school district as to you -- referred to as a

8   miscalculation?

9       A.  No, not that I recall.

10      Q.  Do you know if you received a -- a letter

11  enclosing the revised signed Separation Agreement?

12      A.  I don't recall.

13      Q.  I'm going to show you what we have marked --

14  apologies -- what we have marked Exhibit 8.  You had

15  just testified about a check that you had received from

16  the school district.  Is that the check in your

17  Exhibit 8?

18      A.  Yes, that's the check.

19      Q.  And did you make a copy of this check?

20      A.  Yes.

21      Q.  And is this that copy?

22      A.  Yes.

23      Q.  You had just testified that you weren't sure if

24  whether or not you had received a letter from the school

25  district explaining the miscalculation that you referred

1   to.  Is there any writing that would refresh your

2   recollection as to that?

3       A.  There might be an e-mail or a letter.  I don't

4   recall.  There was a lot of correspondence going back

5   and forth, some e-mail, some U.S. mail.  There was a lot

6   of phone calls between different people and different

7   departments and the school district.  When I would call

8   and ask them things, they would not talk to me because I

9   had an attorney, which they were referring to

10  Ms. Cossairt, my workers' comp attorney.

11      Q.  Ms. Miles, I'm going to return to your affidavit,

12  which is Exhibit 29.  If you look at No. 20, the second

13  sentence it states, "According to a subsequent letter

14  from Mr. Goheen" -- do you see that?

15      A.  I do see that.

16      Q.  -- "stating that the check represented a balance

17  due to me as a result of defendant's alleged error in

18  calculating the amounts of each of the four paychecks."

19      A.  Right.  And that is what I was told by Amy Jo

20  Troyer the night I cleaned out my classroom.

21          THE COURT:  Do you wish to offer Exhibits 8 and

22  9?

23          MR. STIPETICH:  Yes, judge.

24          THE COURT:  Any objection to Exhibits 8 or 9?

25          MR. BOWLES:  No objection.

1          THE COURT:  They're received.

2   BY MR. STIPETICH:

3      Q.   Ms. Miles, when you signed the revised Mutual

4   Separation Release Agreement, did you understand that

5   you were waiving your right to pursue any employment

6   discrimination claims against the school district?

7      A.   No.

8      Q.   Had you known that, would you have signed the

9   agreement?

10      A.   No.

11      Q.   Why did you sign the agreement?

12      A.   I was threatened with being turned over to the

13   district attorney.  I had to preserve my license.  I

14   worked very hard to get that and that was my sole bread

15   and butter.  And without my license, I wouldn't be able

16   to teach.  With federal charges on my record, I wouldn't

17   be able to get a job.  I would have to always answer

18   "yes" to the question and then have to explain it all.

19   I'm never going to do anything that's going to

20   jeopardize my freedom.  And the last thing that I wanted

21   was to be turned over.  This is very traumatic for me.

22   It was -- it was a -- a -- it -- it was just a very

23   scary situation for me.

24      Q.   Ms. Miles, had you corresponded with

25   Miss Cossairt about your efforts to resolve the wage

1    overpayment issue?

2        A.  Yes.

3        Q.  Did she ever represent to you that she was

4    negotiating on your behalf?

5        A.  Yes.

6        Q.  Did you receive any other letters from the school

7    district prior to your meeting with Mr. Turner about

8    repaying the alleged overpayment --

9        A.  Yes.

10       Q.  -- wages?

11           And when would that letter -- strike that.

12           When would you have received that letter?

13       A.  There was one in October and then one again.  I

14   believe it was the end of November.

15       Q.  Do you recall whether you received that letter or

16   your attorney, Ms. Cossairt, received the letter?

17       A.  I don't recall.

18       Q.  Ms. Miles, I'm going to show you what -- show you

19   what we've marked Exhibit No. 11.  Can you tell me what

20   this is?

21           THE COURT:  What number is the exhibit?  I'm

22   sorry.

23           MR. STIPETICH:  I'm sorry, No. 11, judge.

24           THE COURT:  Thank you.

25           THE WITNESS:  It is an e-mail between my workers'

17-2685  Miles v USD 500, et al  3.27.19  _Excerpt

```
 1   comp lawyer, Ms. Cossairt, and it's to me.
 2   BY MR. STIPETICH:
 3      Q.  And if you look at the top --
 4      A.  Can you move it down just a little?  Move the --
 5          THE COURT:  I'm not able to hear you, I'm sorry.
 6          THE WITNESS:  Could you move the paper down just
 7   a little.  There we go.
 8   BY MR. STIPETICH:
 9      Q.  I'm sorry.  If you look at the top, it says it's
10   to Susan.Miles61@yahoo.com.  Is that your e-mail
11   address?
12      A.  Yes.
13      Q.  And there is no "from" at the top on the
14   document; is that right?
15      A.  Uh-huh.  Yes.
16      Q.  And below appears to be signed "Katy" --
17      A.  Uh-huh.
18      Q.  -- Kathleen J. Cossairt?
19          Did you receive this e-mail from Ms. Cossairt?
20      A.  Uh-huh.
21      Q.  Was that yes?
22      A.  Oh, I'm sorry, yes.
23      Q.  And do you see where it states, "I also told him
24   we had hoped to have this be a deduction from your work
25   comp compensation that you may receive on down the
```

1  road"?

2     A.  Yes.

3     Q.  What did you understand that to mean?

4     A.  I understood it to mean that once my workers'

5  comp case was settled, whatever settlement I received

6  from that, the overpayment -- that the $9,600, the

7  overpayment amount, would be taken from that settlement.

8     Q.  You testified earlier that you had been given

9  subsequent to this a December 30th deadline to repay

10  these wages.  Do you know where that deadline came from?

11     A.  I don't.  It was in one of the -- I believe it

12  was in one of the letters.  I'm not a hundred percent

13  sure.

14     Q.  Do you know the reason for that deadline -- I'm

15  sorry, strike that.

16        Were you provided a reason for that deadline?

17     A.  I was told that we want to get this wrapped up by

18  the end of the year if possible.

19     Q.  And did you receive a W-2 for the year 2016 from

20  the school district?

21     A.  Yes.

22     Q.  And what were your annual wages at a typical

23  year?

24     A.  I think I was, like, maybe $58,000.  That would

25  have been my contract.  Wait -- I'm not -- I'm not clear

1  on what I was making at that time.  I don't remember.

2  But I did request a corrected W-2 after speaking with my

3  tax advisor at H&R Block and I never received a

4  corrected W-2.

5     Q.  When you say "corrected," did that mean the W-2

6  you received was incorrect somehow?

7     A.  In my mind it was because I believed the amount

8  that they handed back to me, the $3,000, had to do with

9  tax deductions.  And so I needed to ensure that I hadn't

10  overpaid my taxes over -- that my income wasn't

11  overinflated by the amount that was paid to me.  And so

12  I requested that it be investigated and I get a

13  corrected W-2.  And I received just another standard W-2

14  that had the exact information that was on the original

15  W-2.

16     Q.  Do you recall the amount of wages that were

17  reported to you on the 2016 W-2?

18     A.  I -- I don't remember.  My tax consultant at H&R

19  Block said that I would need to compare the -- the final

20  check stub with the W-2 that was sent.  However, I

21  didn't get a -- a check stub and I -- by the time I

22  needed to do that, it was too late.  I was out of the

23  system and unable to access any of my information, my --

24  my check stub information.

25     Q.  One second.  Ms. Miles, is this the 2016 W-2 that

1   you received from the school district?

2      A.   Yes.

3      Q.   Box 1, does it state 31,370?

4      A.   Yes.

5      Q.   So that is not the correct amount of wages that

6   you earned that year?

7      A.   At this point, I'm not sure.  It would have been

8   my pay from January through July, but I don't know what

9   that would have been and I don't know if that included

10  those paychecks that were submitted in error.

11         MR. STIPETICH:  I don't have anything further.

12         THE COURT:  All right.  Do you wish to cross

13  examine?

14         MR. BOWLES:  I would.  Thank you, Your Honor.

15         THE COURT:  Please.

16         MR. BOWLES:  Your Honor, as a point of order,

17  although I think everything I would have to ask is in

18  the scope of direct anyway, my thought was to do the

19  examination once as opposed to recalling Ms. Miles in

20  our case, if that makes sense with Your Honor and

21  counsel.

22         THE COURT:  Let's -- let me encourage you to ask

23  the questions and see if it draws an objection on that

24  basis and we'll see where we are then.

25         MR. BOWLES:  Sounds good.

1          THE COURT:  The outline you suggest does make

2    sense to me but I'm not -- I can't fairly prejudge what

3    the plaintiff might say.

4          MR. BOWLES:  Consider that a forewarning.

5          THE COURT:  All right.  Fair enough.  Everybody's

6    on notice.

7          MR. BOWLES:  If you don't mind, Your Honor, hand

8    this to the witness.

9          THE COURT:  Sure.

10                     CROSS EXAMINATION

11   BY MR. BOWLES:

12     Q.  Ma'am, I don't know if it's easier for you to see

13   paper exhibits or see them on the display.  I can do

14   them either way as we go.  So if you have trouble seeing

15   those just let me know, okay.

16          I want to ask you a few questions about

17   Exhibit 103, and if you look in that book under the

18   Tab 103 you'll find it.  That's the Mutual Release and

19   Separation Agreement; correct?

20     A.  Yes.  Could you put this on the computer?  It

21   would be easier for me to see.

22     Q.  All right.  You're going to challenge my computer

23   skills, but I think I'm up for it.

24     A.  No, you're fine.  Thank you.

25     Q.  You see it?

1    A.   Uh-huh.

2    Q.   And if we flip to the last page here -- wait for

3  it to come into focus -- that's your signature; correct?

4    A.   Yes.

5    Q.   You feel comfortable that this document that

6  we've entered as 103 is the document that existed as you

7  signed this; correct?

8    A.   Yes.

9    Q.   You're not claiming anyone's changed out pages or

10  changed the language of the agreement; correct?

11    A.   No.

12    Q.   If we look down under No. 1, which says "employee

13  status," do you see that?

14    A.   Yes.

15    Q.   "It is acknowledged by execution of this

16  agreement employee hereby voluntarily resigns."  Do you

17  see that?

18    A.   Yes.

19    Q.   Do you understand that language?

20    A.   Yes.

21    Q.   We've got paragraph 8 entitled Releases By

22  Employer and Employee.  Do you see that?

23    A.   Yes.

24    Q.   I'm going to skip all the way to the very end of

25  this.  Last sentence, see where my finger's at?

1    A.   Yes.

2    Q.   "This release is intended as a full release and

3   discharge of all claims of every nature and kind arising

4   out of, related to, or in connection with employee's

5   employment with employer."  Do you see that?

6    A.   Yes.

7    Q.   Do you understand that language?

8    A.   Yes.

9    Q.   I'd like to look at Item 13.  See where my

10  finger's at there?

11   A.   Yes.

12   Q.   It says, "Both parties hereby acknowledge and

13  affirm that it is their intention to execute this

14  agreement with each other in good faith."  Do you

15  understand that?

16   A.   Yes.

17   Q.   Additionally, "Employee acknowledges and affirms

18  that (A) her election to accept this agreement is

19  entirely voluntary."

20   A.   Yes.

21   Q.   Do you understand that language?

22   A.   Yes.

23   Q.   "(B) she has read and understands this

24  agreement."  Do you understand that language?

25   A.   Yes.

1    Q.  And if we flip to the final page again where we

2  have your signature, we've got this block of language

3  right above your signature; correct?

4    A.  Yes.

5    Q.  It says, "I, Susan Miles, agree that I am

6  voluntarily entering into this binding agreement."  Do

7  you see that?

8    A.  Yes.

9    Q.  And that was there when you signed this; correct?

10    A.  Yes.

11    Q.  And you understand that language; correct?

12    A.  Yes.

13    Q.  And it further says, "I acknowledge that my

14  separation from my employment with Kansas City, Kansas,

15  Unified School District 500, Wyandotte County, Kansas is

16  in accordance with the terms set out in this document."

17  Correct?

18    A.  Yes.

19    Q.  And if we look down here at the notary, the

20  date's January 9th of 2017, and that's the date that you

21  signed this; correct?

22    A.  Yes.

23    Q.  And you had an opportunity to review a prior

24  draft of that Mutual Release several days before you

25  signed it; is that correct?

1       A.   Yes.

2            MR. STIPETICH:  Objection.  Misstates the prior

3    testimony.

4            THE COURT:  I didn't hear the objection.

5            MR. STIPETICH:  Objection.  Misstates her prior

6    testimony.

7            THE COURT:  That's overruled.

8    BY MR. BOWLES:

9       Q.   In fact, you came to our law offices on January

10   5th of 2017 and met with Mr. Turner; correct?

11      A.   I'm not sure of the date, but I did meet with

12   Mr. Turner.

13      Q.   Let me see if we look at your affidavit, because

14   it's got some dates in it; correct?

15      A.   Yes.

16      Q.   You're comfortable the affidavit you did in this

17   case is correct, that it's accurate?

18      A.   Yes.

19      Q.   All right.  Let's look at paragraph 15.  I

20   apologize that I scribbled on this.  I didn't realize I

21   was going to be putting it up here.

22      A.   It is fine.

23      Q.   Paragraph 15, first sentence says, "On or about

24   January 5th, 2017, I went to McAnany, Van Cleave &

25   Phillips and met with Mr. Turner in person in a

1    conference room."  Correct?

2        A.  Yes.

3        Q.  And continues, "I delivered a cashier's check for

4    $9,678.68 payable to defendant."  Correct?

5        A.  Yes.

6        Q.  And so on January 5th, the first time that you

7    came to our offices, you were presented with a draft

8    agreement; correct?

9        A.  Yes.

10       Q.  You were given a chance to read that?

11       A.  Yes.

12       Q.  And you had the money that had been requested for

13   the overpayment; correct?

14       A.  Yes.

15       Q.  And isn't it true that on January 5th that

16   Mr. Turner ultimately suggested that you meet with your

17   attorney about that agreement?

18       A.  Yes.

19       Q.  Mr. Turner gave you time to sit in the conference

20   room and read that agreement; correct?

21       A.  Yes.

22       Q.  Did he pressure you to sign it that day?

23       A.  I felt pressured to sign it.

24       Q.  Did you feel pressured to sign it when he

25   suggested that you talk to your attorney about it?

1    A.  No.  I felt like that was a good suggestion.

2    Q.  And that was from Mr. Turner; correct?

3    A.  Yes.

4    Q.  And so you left with a copy of the draft

5  agreement?

6    A.  Yes.

7    Q.  He let you take a copy with you?

8    A.  Yes.

9    Q.  And you met with an attorney?

10   A.  I met with a worker's comp attorney.

11   Q.  Is that an attorney?

12   A.  It is an attorney.

13   Q.  You met with an attorney; correct?

14   A.  Yes, a workers' comp attorney.

15   Q.  The attorney that you chose to meet with?

16   A.  It was the attorney that Mr. Turner had contacted

17  earlier to tell me that I was not to return to work

18  until the matter was settled.

19   Q.  Did you decide to see Ms. Cossairt or were you

20  following Mr. Turner's direction?

21   A.  It was the only attorney I had.

22   Q.  Okay.

23   A.  And I was following Mr. Turner's direction.

24   Q.  So you consulted with your attorney; correct?

25   A.  Yes.

1      Q.   And you gave her a copy of the agreement?

2      A.   She read the one I took in.

3      Q.   And, in fact, between the two of you, a

4  suggestion was made to add a clause so that unemployment

5  benefits wouldn't be challenged; is that correct?

6      A.   That is correct.

7      Q.   And you contacted Mr. Turner about that?

8      A.   Yes.

9      Q.   And what happened?

10      A.   The clause was entered into the Mutual Separation

11  Agreement.

12      Q.   And then the revised agreement was e-mailed to

13  you that next day on January 6th; is that right?

14      A.   That is correct.

15      Q.   You didn't sign it on January 6th; is that right?

16      A.   That is correct.

17      Q.   You came back into our offices three days later

18  on January 9th?

19      A.   Yes.

20      Q.   And at that time, after having had the revised

21  agreement for three days, you signed it --

22      A.   Yes.

23      Q.   -- is that right?

24      A.   Yes.

25      Q.   You'd agree with me that you had an opportunity

1    to review the agreement before you signed it; true?

2        A.  Yes.

3        Q.  You'd agree with me that you had an opportunity

4    to consult with an attorney before you signed it; true?

5        A.  Yes.

6        Q.  And you'd agree with me that you had an

7    opportunity to negotiate terms before you signed that

8    agreement?

9        A.  Yes.

10       Q.  In fact, you did negotiate terms.  You had a term

11   added; correct?

12       A.  Yes.

13       Q.  I want to talk to you a little bit about the

14   payroll issue if that's okay, ma'am.  If I understand it

15   correctly, you were on FMLA leave from August 9th, 2016

16   through November 2nd, 2016?

17       A.  That is correct.

18       Q.  And you understood that FMLA leave is unpaid?

19       A.  Yes.

20       Q.  And you knew shortly after you got that first

21   incorrect paycheck that it was a mistake, didn't you?

22       A.  I suspected there was something wrong.  That's

23   why I called my attorney and -- and called the school

24   district.

25       Q.  In fact, you strongly suspected it was a mistake;

17-2685  Miles v USD 500, et al  3.27.19  _Excerpt          41

```
 1   correct?

 2       A.   Yes, that's why I called the school district.

 3       Q.   And there are several e-mails where you contact

 4   the school district, contact your attorney; correct?

 5       A.   Yes.

 6       Q.   And their responses back showing, quite frankly,

 7   a bit of confusion on the part of the district as to

 8   what's going on.  Do you think that's a fair statement?

 9       A.   I don't know.

10            MR. STIPETICH:  Objection.  Hearsay.

11            MR. BOWLES:  I think there was an objection,

12   judge.

13            THE COURT:  I didn't hear it.

14            MR. STIPETICH:  Objection.  Hearsay.

15            THE COURT:  It does not ask -- the statement asks

16   for the witness perception of the words that were

17   spoken, so I'm going to overrule the objection.

18            THE WITNESS:  I can't --

19   BY MR. BOWLES:

20       Q.   Do you remember what my question was at this

21   point?

22       A.   Actually, no, I don't.

23       Q.   Let me restate.

24            THE COURT:  Try a new question.

25   BY MR. BOWLES:
```

1     Q.    Sure.   Would you agree that the various e-mails

2   back and forth with the district, when you raised this

3   payroll issue, showed confusion on the part of the

4   district?

5     A.    I can't presume to know what was going on in the

6   heads of the people at the district.   I don't know.

7     Q.    Did you get a clear answer from anyone?

8     A.    No.

9     Q.    Does that seem to be confused?

10          It seemed like they didn't really know what was

11   going on; is that fair?

12    A.    I don't know that I would call it confusion.   I

13   would definitely say they had no clue what was going on.

14    Q.    Okay.   What I didn't see in those e-mails was a

15   definitive response saying that it was okay for you to

16   keep that money.   Did you ever get a response like that?

17    A.    Yes.

18    Q.    In writing?

19    A.    No.

20    Q.    I also didn't see a definitive response from your

21   attorney saying it was okay for you to keep that money.

22   Did you get one of those?

23    A.    Not in writing; verbally, yes.

24    Q.    You were told by your attorney that you couldn't

25   receive temporary total disability benefits and regular

1    pay at the same time; correct?

2       A.  Correct.

3       Q.  And you understood that?

4       A.  Correct.  At that point though, I hadn't received

5    any temporary total disability.

6       Q.  And by the time you received Mr. Greenbaum's

7    letter, you had received TTD benefits; correct?

8       A.  Yes.

9       Q.  And --

10      A.  I received those in October.

11      Q.  And by the time you received Mr. Goheen's letter,

12   you had received TTD benefits; correct?

13      A.  Yes, but the paychecks had stopped by then.

14      Q.  And those TTD benefits went backwards in time.

15   You understood that; correct?

16      A.  Yes.

17      Q.  They weren't going -- paying you forward.  They

18   paid you back --

19      A.  Yes.

20      Q.  -- to the beginning of the school year; right?

21      A.  Yes.

22      Q.  Are you claiming to the court here today that

23   back in January of 2017 that you were not competent to

24   sign a contract?

25      A.  Yes.

17-2685  Miles v USD 500, et al  3.27.19  _Excerpt

1    Q.   You were released to return to work on December

2    20th of 2016; correct?

3    A.   Yes.

4    Q.   And the job that you were released to return to

5    was as a teacher; right?

6    A.   No.

7    Q.   What were you released to return to?

8    A.   I was released to work part-time, no more than

9    30 hours a week, and I went to work as a

10   paraprofessional.

11   Q.   You wanted to come back to work January 4th of

12   2017?

13   A.   Yes, I did.

14   Q.   For USD 500?

15   A.   Yes.

16   Q.   Not as a paraprofessional?

17   A.   That is correct.

18   Q.   You wanted to be a teacher.  You wanted to be a

19   teacher on January 4th of 2017 for USD 500; correct?

20   A.   Yes, I wanted to return to my job.

21   Q.   And you thought you could do that?

22   A.   Yes.

23   Q.   You didn't have to be a paraprofessional because

24   you were incompetent; correct?

25   A.   No, I had to be a paraprofessional because my

 1    contract was terminated by USD 500.

 2        Q.   And that didn't have anything to do with your

 3    competency; correct?

 4        A.   The termination of my contract?

 5        Q.   You were being a paraprofessional --

 6        A.   It had to do with my post-concussion syndrome.

 7        Q.   But you felt confident you could have been a

 8    teacher at USD 500 on January 4th of 2017?

 9        A.   Yes.

10        Q.   And you signed this agreement on January 9th of

11    2017?

12        A.   Yes.

13        Q.   You also worked as a cashier in December; is that

14    right --

15        A.   That is correct.

16        Q.   -- for Price Chopper?

17        A.   Yes.

18        Q.   You were able to do that?

19        A.   I was on a modified schedule, yes.  That was an

20    experiment to see if I could go back to work and manage

21    the post-concussion syndrome.

22        Q.   And --

23        A.   It was extremely difficult.

24        Q.   And, as you stated a moment ago, later in January

25    of 2017, you started work as a paraprofessional --

1     A.   Correct.

2     Q.   -- for -- is that Spring Hill?

3     A.   Yes.

4     Q.   And you did that through the school year?

5     A.   I did it until the end of April.

6     Q.   Was that through the school year or were you just

7    short?

8     A.   No, I left about a month before the end of

9    school.

10    Q.   Okay.  So you did about three or four months?

11    A.   About three months.

12    Q.   Okay.  And then over the summer worked as a

13   clerical job at Ditch Witch?

14    A.   Yes.

15    Q.   And then in August started as a 7th grade teacher

16   in Leavenworth?

17    A.   Yes.

18    Q.   And you were able to do all those things?

19    A.   Yes.

20    Q.   All right.  I want to look for a moment with you

21   again at your affidavit if that's okay, which I think

22   was marked as Exhibit 29.  I want to look at

23   paragraph 16 which talks about the second time that you

24   came back to the office and then signed the agreement.

25   Can you see that okay?

1    A.  Yes.

2    Q.  It says, "On or about January 9th of 2017, I

3  returned to McAnany's office and again met solely with

4  Mr. Turner.  He presented me with a second version of

5  the agreement, pointing out the added clause regarding

6  unemployment.  He told me it was a standard mutual

7  agreement and consistent with virtually every mutual

8  separation agreement.  Mr. Turner made small-talk and

9  stated that he 'felt bad' that I did not have good legal

10  representation on this matter.  At this point, feeling I

11  had no other option but to sign the agreement as I would

12  otherwise face criminal charges, I signed the

13  agreement."  Did I read that correctly?

14    A.  Yes.

15    Q.  You testified on direct that in that meeting

16  Mr. Turner said some things like -- or that you said to

17  Mr. Turner that you had to trust him --

18    A.  Yes.

19    Q.  -- that you didn't have any choice.  You

20  testified you said that to him?

21    A.  I didn't have any choice.

22    Q.  I'm just asking what you -- what you said --

23    A.  Yes.

24    Q.  -- to Mr. Turner.

25         And that you didn't have time to understand the

1   agreement?

2      A.  That is correct.

3      Q.  I don't see any of those statements reflected in

4   this affidavit; is that fair?

5      A.  I would say you're correct it is not stated

6   explicitly.

7      Q.  Okay.

8      A.  However, it is alluded to, "small-talk."

9      Q.  You reference in the -- I guess it's the last

10  sentence feeling like you didn't have a choice because

11  otherwise you would face criminal charges; correct?

12     A.  That is correct.

13     Q.  That you already had the funds to pay back the

14  deficiency because you had that with you the week

15  before; is that right?

16     A.  The threat of criminal charges was before I had

17  the money.  That was before -- the deadline was December

18  30th.

19     Q.  Right.

20     A.  It was a Saturday.  It was a holiday weekend.  It

21  was a deadline impossible for anyone to make, including

22  me.

23     Q.  And no one was discussing that on January 9th of

24  2017?

25     A.  No.  I was told that because I was late with the

1  funds I was being terminated.

2     Q.  Even though you'd had the funds the week before

3  and even though --

4     A.  I didn't have the funds the week before.  They

5  came in on the first business day of the new year.

6     Q.  Well, if this is January 9th -- I'm speaking the

7  week before that you signed the agreement.

8         I probably asked you an ambiguous question.  Let

9  me start over.  On January 9th of 2017, you had already

10  had the funds available for several days; is that fair?

11    A.  Yes.

12        THE COURT:  Do you have a bit to go in your cross

13  examination?

14        MR. BOWLES:  Probably about a minute or two.

15        THE COURT:  Try to get to that, then we'll take

16  our mid-morning recess.

17        MR. BOWLES:  Sounds good, judge.  That will give

18  me a goal.

19  BY MR. BOWLES:

20    Q.  You were asked about Exhibit 11 -- let this come

21  into focus here -- which is an e-mail, if I understand

22  it correct, to you from your attorney; correct?

23    A.  That would be correct.

24    Q.  And it look like it's dated November 22nd of

25  2016; right?

 1     A.   Yes.

 2          May I ask what you're covering up with your

 3    finger?

 4     Q.   I wrote on this.  I intended for the book to be

 5    used.  These are my chicken scratch notes.  It's nothing

 6    exciting that you would want to see, I assure you.

 7          And this is your attorney telling you that she

 8    had spoken with Mr. Goheen; correct?

 9     A.   That is correct.

10     Q.   After the letter that he wrote?

11     A.   Yes.

12     Q.   And there's a reference here to getting

13    information from the district recommended by Mr. Guinn,

14    G-U-I-N-N.  Do you see that?

15     A.   Yes.

16     Q.   And do you understand Mr. Guinn was Rick Guinn

17    and he's an employment attorney?

18     A.   Yes.

19     Q.   Did you consult with Mr. Guinn?

20     A.   I did talk to Mr. Guinn.  I had no idea he was an

21    employment attorney at the time.

22     Q.   Did you consult with him about the payroll issue?

23     A.   Yes.

24     Q.   And you did that before you ever signed the

25    release?

1     A.   Yes.

2          MR. BOWLES:  That's all I have, judge.

3          THE COURT:  All right.  Just so it's clear,

4    Exhibit 11 -- both parties have referenced Exhibit 11.

5    It was never offered.  I wanted to notify counsel if it

6    was intended to be offered, it hasn't happened.

7          MR. STIPETICH:  I'm sorry, judge, yes, it was.

8          THE COURT:  The offer of Exhibit 11.  Is there

9    any objection?

10         MR. BOWLES:  No, judge.

11         THE COURT:  It's received.

12         Mr. Stipetich, will you have redirect for the

13   witness?

14         MR. STIPETICH:  I do very briefly and I'm fine

15   with doing that after the recess.

16         THE COURT:  Say that again.

17         MR. STIPETICH:  I'm fine with doing that after

18   the recess.

19         THE COURT:  Yeah, we've been going a while.  So

20   let's go ahead and take the mid-morning recess and we'll

21   come back.  And, Ms. Miles, if you'll be back in the

22   witness chair when we resume.  It's about 20 until the

23   hour.  Let's aim to be ready to come back into the

24   courtroom at 10:00 till.  All right.  See you then.

25   Thank you very much.

1      (Recess.)

2      THE COURT:  All right.  Mr. Stipetich, I think

3  you were planning to conduct some redirect examination

4  of the witness.  You may proceed.

5      MR. STIPETICH:  Yes, judge.

6                    REDIRECT EXAMINATION

7  BY MR. STIPETICH:

8      Q.  Ms. Miles, you had just testified on cross

9  examination that you were given an opportunity to review

10  the final Mutual Release and Separation Agreement.  How

11  much time were you given?

12     A.  From the 6th through the -- to the 9th it was --

13  I don't recall.  I don't know how much time.

14      THE COURT:  I'm sorry, I'm not able to hear you.

15      THE WITNESS:  Oh, I'm sorry.  I don't recall

16  exactly how much time.  I received it on the 6th.  I

17  returned it on the 9th.  So I had it in my possession

18  approximately three days.  I didn't spend the whole

19  three days on it.

20  BY MR. STIPETICH:

21     Q.  Do you recall whether or not you reviewed the

22  agreement during those three days?

23     A.  I don't recall.  I -- I -- in -- at the law firm,

24  Mr. Turner gave me a copy of it to sign.  I -- I don't

25  recall how much I reviewed it.  I did look at it.  I

1  tried to make sense of it.

2     Q.  And I just want to clarify.  Did you print off a

3  copy of the agreement prior to January 9th?

4     A.  I don't recall.

5     Q.  And you had -- strike that.

6        Did Mr. Turner give you a deadline to return the

7  agreement?

8     A.  I don't recall.

9     Q.  You don't recall if Mr. Turner told you you had a

10  number of days in which to sign the agreement?

11     A.  No, I -- he had to have it back because I was

12  terminated and so he -- he said -- he gave me the

13  revised copy during -- by e-mail.  And then I know they

14  wanted it back as soon as possible and then I would

15  clean out my room after that.  That was...

16     Q.  So Mr. Turner told you to have the agreement

17  signed as soon as possible?

18     A.  Yes.

19     Q.  You had testified today that you understood

20  various parts of the agreement on cross examination

21  today.  Did you understand those portions of the

22  agreement in January 2017?

23     A.  No.

24     Q.  You also had testified that you had difficulty

25  reading the agreement?

1   A.   That is correct.

2   Q.   And without going into any medical diagnoses, are

3   there any accommodations that you -- that you have for

4   those reading difficulties?

5   A.   Yes.  I chose books that are in larger print.  I

6   use the zoom features when I'm typing -- or when I'm

7   writing on the computer.  I use larger font sizes.

8   Sometimes I have to print things off and enlarge it on

9   the copier.  So I do have to make accommodations to this

10  day for -- for reading.

11  Q.   Do you use any particular equipment in the

12  classroom that accommodates you?

13  A.   I had to use ladders to raise myself up to the

14  point that I could write on my whiteboard right at the

15  top of my whiteboard because with my vertigo I could not

16  look up without getting dizzy.  So I bought a ladder, a

17  step stool to use in my classroom so I could be eye

18  level with my whiteboard so I could write at the top of

19  it.

20  Q.   Did you use a step stool in the amount of time

21  that you worked at the Unified School District 500 after

22  your injury?

23  A.   Yes.  I was released to go back to work the

24  Wednesday after the accident.  It was maybe the

25  following week that I realized that I just -- I can't do

1   this anymore.  I tried standing on chairs and writing.

2   But then, when I went to step down off the chair, the

3   step was so far down that my vertigo kicked in and the

4   world would start spinning.  So I went and bought a step

5   stool so that I could just walk down as if I was walking

6   backwards downstairs.

7       Q.  And you had testified about a conversation you

8   had with Mr. Rick Guinn.  How did you come to know

9   Mr. Guinn?

10      A.  He was an associate of Katy's.  And when Katy and

11  I were -- were discussing this issue of repayment, she

12  and Mr. Greenbaum had worked out that it would all be --

13  come out in the wash at the end of the workers' comp

14  settlement.  I didn't feel comfortable with that because

15  I didn't want this hanging over my head.

16          So she referred me to an associate.  So I met

17  with him and just talked briefly about it.  And he says,

18  "It sounds as good a plan as any," and I left.  I didn't

19  know what his particular area of expertise was.  I knew

20  him as an associate of Katy.  I assumed he was workers'

21  comp.  I had no idea.

22      Q.  Did Mr. Guinn end up representing you in any

23  capacity?

24      A.  No.

25      Q.  Do you recall if he provided you with any

1  proposed terms of representation?

2   A.  He said that if he were to ever represent me, he

3  would require a $10,000 retainer and then a ridiculous

4  amount per hour plus -- plus expenses.  And I didn't

5  even -- it wasn't -- it wasn't even a consideration to

6  hire him for anything.

7       First of all, I didn't know what type of law he

8  practiced.  And, second of all, I didn't particularly

9  mesh with him personality-wise.  And so, no, there was

10  no -- there was no agreement or any kind of affiliation

11  beyond just that one brief time in his office and it was

12  a very short meeting.

13   Q.  Finally, Ms. Miles, you had testified on cross

14  examination that you felt pressured to sign the

15  agreement.  Were you concerned for your freedom?

16   A.  Absolutely.  I have never, ever had anyone accuse

17  me of committing a felony or filing federal charges

18  against me, and that literally scared me to death

19  that -- my freedom is one of the things that I hold very

20  near and dear to my heart and I don't ever want to do

21  anything to jeopardize that, which is why this was such

22  a huge deal to me and why I didn't want to wait until

23  the end of the workers' comp to get this settled.  I

24  wanted it done.

25       I didn't know where this case was going to go.

1   And when I got -- when I was then threatened with being

2   turned over to the district attorney, that -- that was

3   traumatic for me.  It was absolutely horrific.

4        MR. STIPETICH:  Thank you, Ms. Miles.  No further

5   questions.

6        THE COURT:  Mr. Bowles, do you wish to redirect?

7        MR. BOWLES:  No, thank you, Your Honor.

8        THE COURT:  Or recross, I apologize?

9        MR. BOWLES:  No questions for the witness.

10       MR. STIPETICH:  No.

11       THE COURT:  Ms. Miles, you may step down.

12       Mr. Stipetich, do you have additional evidence

13   you wish to present?

14       MR. STIPETICH:  Yes, judge.  I'd like to call Rob

15   Turner to the stand.

16       THE COURT:  Mr. Turner.  If you'll, please, come

17   to the witness stand and pause to accept the oath.

18                    ROBERT P. TURNER,

19   called as a witness on behalf of the Plaintiff, having

20   first been duly sworn, testified as follows:

21       THE COURT:  Please feel free to move things

22   around.  If you would just say your full name for the

23   record.

24       THE WITNESS:  Robert Paul Turner.

25       THE COURT:  Thank you, Mr. Turner.

1          Mr. Stipetich, you may proceed.

2                    DIRECT EXAMINATION

3    BY MR. STIPETICH:

4       Q.  Mr. Turner, I'm going to show you what we have

5    marked as Exhibit 5.  What is this document?

6       A.  It's a -- it's an e-mail between myself and Katy

7    Cossairt, and Mr. Goheen is on there as well as Mr. --

8    as well as Mr. Greenbaum.

9       Q.  And in the first sentence here it states, "While

10   I understand you are waiting on your client's response,

11   we would like to get this resolved prior to the end of

12   the year if possible."  By "we" are you referring to you

13   and your client?

14      A.  Yes.

15      Q.  And are you referring to the alleged overpayment

16   issue when you say "this"?

17      A.  Yes.

18      Q.  And you state "if possible."  So that means there

19   wasn't any urgency to resolve this by the end of the

20   year; is that fair?

21      A.  I believe there was urgency and I think we -- we

22   had asked in prior correspondence as well that it be

23   resolved prior to the end of the year.

24      Q.  What was the urgency?

25      A.  Well, as with the end of the year approaching and

1    that overpayment outstanding, you run into issues with,

2    as I mentioned below, taxes and other implications that

3    would have to be corrected, and that becomes difficult

4    after the first of the year.

5        Q.   And then you state here, "There's no guarantee

6    the district will be able to defer referral of the

7    matter to the district attorney once the new year rolls

8    around."  What did you mean by that?

9        A.   I just meant that once -- once the end of the

10   year passed, there was no guarantee they would wait any

11   longer to do that if the repayment was still outstanding

12   as it states there.

13       Q.   And you're a Kansas licensed attorney; correct?

14       A.   Yes, that's correct.

15       Q.   Do you practice criminal law?

16       A.   Criminal law?

17       Q.   Yes.

18       A.   I do not.

19       Q.   Have you ever practiced criminal law?

20       A.   No.

21       Q.   Have you ever worked as a prosecutor?

22       A.   I have not.

23       Q.   What law do you believe, if any, that Ms. Miles

24   violated, criminal law?

25       A.   I don't recall off the top of my head exactly

1   which statute it may have fallen under, and that's --

2   that's why we'd refer it to the district attorney for

3   their determination.

4       Q.  So you would not determine whether or not a crime

5   had been committed; correct?

6       A.  I -- no, I couldn't convict her of that.  That

7   would be something that the DA would pursue.

8       Q.  If you go to your prior communications with --

9   strike that.

10      Ms. Miles is claiming that you spoke with her on

11  January 3rd by phone.  Does that conversation occur?

12      A.  I believe it was actually the 4th.

13      Q.  And you did tell her that she could not return to

14  work unless she repaid the $9,678 in wages?

15      A.  I told her at that time she couldn't return to

16  work due to the outstanding repayment issue.

17      Q.  And you told her that she would be terminated if

18  she did not repay those funds?

19      A.  I did not tell her she was terminated at that

20  time.

21      Q.  When did you tell her that she was terminated?

22      A.  I never told her she was terminated.

23      Q.  Did your meeting with Ms. Miles, your first

24  meeting, did that occur on January 5th?

25      A.  Yes, it did.

1     Q.  And I'm referring to January 5th, 2017.  Had you

2  advised Ms. Miles prior to that meeting that she had an

3  opportunity to consult with independent counsel prior to

4  reviewing the agreement?

5     A.  Are you asking me if I told her that prior to us

6  meeting on the 5th?

7     Q.  Correct.

8     A.  I -- I can't recall if I told her prior to that

9  in-person meeting or not.

10    Q.  And isn't it true that you did tell Ms. Miles

11 that she needed to execute the agreement as soon as

12 possible?

13    A.  I don't think I said it to her that way, and I

14 don't think I told her that she needed to execute the

15 agreement.  I just told her that if it was agreeable to

16 her, to please return it to us.

17    Q.  I'm going to show you what's been marked as

18 Exhibit 2.

19        THE COURT:  Do you wish to offer Exhibit 5?

20        MR. STIPETICH:  I'm sorry.  Yes, judge.

21        THE COURT:  Any objection to Exhibit 5?

22        MR. BOWLES:  No, judge.

23        THE COURT:  It's received.

24 BY MR. STIPETICH:

25    Q.  Mr. Turner, what is Exhibit 2?

1    A.  It's an e-mail dated January 6th, 2017 between

2  myself and Ms. Miles.

3    Q.  And at the bottom of page 1 of Exhibit 2, is this

4  an e-mail between you and Ms. Miles on January 6th,

5  2017?

6    A.  It is.

7    Q.  And here you state, "If agreeable, please sign

8  and return the original agreement to me as soon as

9  possible."  Did I read that correctly?

10    A.  You did.

11    Q.  So you did tell Ms. Miles to return the agreement

12  as soon as possible?

13    A.  I did.  In that e-mail it looks like I did.  I

14  remember that now that I see the e-mail.

15    Q.  When you met with Ms. Miles on the first

16  occasion, was her -- what was her demeanor?

17    A.  When I met with her on January 5th?

18    Q.  Yes.

19    A.  I don't recall anything specific about her

20  demeanor that stood out to me as -- as abnormal or out

21  of the ordinary.

22    Q.  Did -- did you witness Ms. Miles looking over the

23  first amendment?

24    A.  I did see her review it at least in part.

25    Q.  And it's true that, when you initially met with

1    Ms. Miles in the conference room, you did not mention

2    that she had a right to seek independent counsel?

3       A.  No, that's not right.  I did tell her during that

4    meeting that she certainly had the right to seek counsel

5    if she'd like to do so.

6       Q.  And when you say "during that meeting," about

7    when during that meeting?

8       A.  I can't recall exactly when it would have been.

9    At some point during the meeting, that's all I can

10   remember.

11       MR. STIPETICH:  Judge, we'd move to admit Exhibit

12   No. 2.

13       THE COURT:  There's an offer of Exhibit No. 2.

14   Is there objection?

15       MR. BOWLES:  No objection.

16       THE COURT:  It's received.

17   BY MR. STIPETICH:

18       Q.  Mr. Turner, I want to go back briefly to

19   Exhibit 5.  On the bottom of page 1, there's an e-mail

20   between Ms. Cossairt, Mr. Goheen, and you on December

21   28th, 2016; is that accurate?

22       A.  Yeah.  At least what I can see on the first

23   page there, yes, it looks like that's what it is, or

24   part of it.

25       Q.  And if you look at the second page, the top of

1    the second page, Ms. Cossairt states, the last sentence,

2    "Please contact me after the first of the year to get

3    this matter resolved."  Did you attempt to contact

4    Ms. Cossairt prior to January 3rd, 2017?

5        A.  No, I did not.

6        Q.  Had you been corresponding with Ms. Cossairt

7    about the plaintiff's wage overpayment issue in December

8    2016?

9        A.  The first time that I corresponded with her would

10   have been December 28th, 2016.

11       Q.  And prior to that was Mr. Goheen corresponding --

12   strike that.

13           Prior to that who, if anyone, from your office

14   was corresponding with Ms. Cossairt?

15       A.  I believe Mr. Goheen had and I think

16   Mr. Greenbaum had.

17       Q.  Did you ever discuss with Ms. Miles the issue of

18   the school district seeking a suspension of her teaching

19   license?

20       A.  I'm not sure I understand what you -- what you

21   mean by that question.

22       Q.  Well, here I'm going to go back to Exhibit 2 --

23   I'm sorry, Exhibit 5.  On the last sentence here where

24   you are discussing referring the matter to the district

25   attorney, did you ever discuss with Ms. Miles whether or

1   not, in addition to you referring the matter to the

2   district attorney, that the school district would pursue

3   suspension -- a suspension of Ms. Miles' teaching

4   license?

5       A.  No.

6       Q.  What would the tax implications be for the school

7   district of waiting until after December 30th to resolve

8   the wage overpayment issue?

9       A.  I don't know the specific numbers, but I do know

10  that, related to tax withholdings that would have been

11  in the paychecks, that that would go to her and the

12  recovery or corrections for those amounts, and, you

13  know, whether that happened prior to the end of the year

14  or after the year turned over to the next year.  And I

15  understood that it could potentially be more difficult

16  after we hit the new year.

17      Q.  Although you were working with Ms. Cossairt on

18  negotiating a repayment as of December 28th, 2016?

19      A.  Yes.  We -- we had discussed that as reflected in

20  these e-mails that summarized our phone conversations.

21      Q.  And you were aware that Ms. Miles had been in the

22  process of securing a loan to repay those funds?

23      A.  Ms. Cossairt had informed me that she was

24  attempting to, but I didn't know the exact status of it

25  at that time.

1      MR. STIPETICH:  I don't have any further

2  questions.

3      THE COURT:  Any cross examination for the

4  witness?

5      MR. BOWLES:  Yes, Your Honor.

6                   CROSS EXAMINATION

7  BY MR. BOWLES:

8    Q.  Mr. Turner, do you have the witness notebook up

9  there?

10   A.  Yeah, it looks like I do.

11   Q.  I want to look at Exhibit 102.  Do you have that

12  in front of you?

13   A.  I do.

14   Q.  Can you describe for us what that is?

15   A.  It's an e-mail from myself to Ms. Cossairt as a

16  follow-up to our phone conversations that occurred on

17  December 28th, 2016.

18      MR. BOWLES:  Your Honor, I'd move to admit

19  Exhibit 102.

20      THE COURT:  Is there any objection to 102?

21      MR. STIPETICH:  No objection.

22      THE COURT:  It looks like it's the same thing as

23  Exhibit 2.  If I'm missing --

24      MR. BOWLES:  I wasn't sure if it had the first

25  piece on here or not, Your Honor.  It may be.

 1         THE COURT:  That's fine.  That's not -- it's --
 2   Exhibit 102 is received.
 3         MR. BOWLES:  All right.
 4         THE COURT:  I just thought as a courtesy I would
 5   point that out if it mattered to you.
 6         MR. BOWLES:  I appreciate it, judge.  It won't be
 7   the last time I do that most likely.
 8   BY MR. BOWLES:
 9     Q.  You say in this e-mail back to Ms. Cossairt on
10   December 28th, talking about the timing issue, "While I
11   understand you're waiting on your client's response, we
12   would like to get this resolved prior to the end of the
13   year if possible.  As we discussed today, the amount
14   Ms. Miles owes the district is $9,678.68.  As explained,
15   the district will be forced to forward this matter to
16   the district attorney for handling if not resolved as
17   they always have done."  Do you see that?
18     A.  Yes.
19     Q.  First off, and I think you talk a little bit
20   about this on -- on direct, neither the district, nor
21   you, nor Mr. Goheen were going to bring criminal
22   charges; is that correct?
23     A.  That's correct.
24     Q.  Why is that?
25     A.  That's something the district attorney would

 1   determine whether or not to bring charges.  We couldn't

 2   do that.

 3       Q.   There was discussion about referring the matter

 4   to the district attorney and letting the district

 5   attorney determine whether or not to file charges;

 6   right?

 7       A.   That's right.

 8       Q.   And there's a reference in your e-mail to "as

 9   they have done before."  What's that about?

10       A.   It was my understanding that they -- they have

11   done that in the past when there's been issues of

12   overpayment or funds that have been misused or

13   misplaced.

14       Q.   After your e-mail of December 28th, did you have

15   any other contact with Ms. Cossairt the rest of the

16   2016?

17       A.   I did not.

18       Q.   Let's look at Exhibit 5 -- or 105, excuse me.

19   And can you describe for us what this is?

20       A.   Yes.  It's an e-mail I received from Ms. Cossairt

21   on Tuesday, January 3rd, 2017, advising me that she had

22   just spoken with Ms. Miles.

23           MR. BOWLES:  Your Honor, I'd move to admit

24   Exhibit 105.

25           THE COURT:  Any objection to 105?

```
 1          MR. STIPETICH:  No objection.

 2          THE COURT:  It's received.

 3   BY MR. BOWLES:

 4     Q.  Had you had telephone conversations that day with

 5   Ms. Cossairt as well?

 6     A.  Yes.

 7     Q.  And tell us what you can recall about those.

 8     A.  She contacted me and basically told me the same

 9   thing as what's in this e-mail, which is that, you know,

10   Ms. Cossairt wasn't handling this matter for her and

11   that she might be trying to contact an employment

12   attorney.  And she didn't tell me that Ms. Miles had any

13   of the funds at that point.

14     Q.  Did you reach out and contact Ms. Miles at that

15   point?

16     A.  No, I did not.

17     Q.  And why not?

18     A.  Ms. Cossairt had informed me that Susan would be

19   hiring an employment attorney, so it was my assumption

20   that I would either hear from Ms. Miles or an attorney

21   representing her.

22     Q.  All right.  And on January 4th, who did you hear

23   from?

24     A.  Ms. Miles.

25     Q.  And tell me what you can recall about your --
```

 1    phone conversations that day.

 2       A.   Ms. Miles called me and did ask if she could

 3    return to work, and I told her that she could not at

 4    that time due to the overpayment issue.  And I believe

 5    the -- as we had previously offered the resignation and

 6    release that was discussed, whether or not she would

 7    want to do that.

 8            And she -- we had multiple phone conversations,

 9    so I'm having trouble distinguishing each one.  But,

10    ultimately, by the last phone conversation at the end of

11    the day, she had concluded that she would agree to

12    resign.

13            And as far as whether or not she'd be hiring an

14    employment attorney, I know I did ask her if she was,

15    and she told me at that time she wasn't and that's why

16    she had contacted me directly.

17       Q.   Did she raise a few concerns about the

18    resignation as relates to getting property back?

19       A.   She did, yes.

20       Q.   And tell me what you recall about that.

21       A.   She is -- as best as I can remember, she was

22    concerned if she did resign how she would get her

23    personal property from her classroom.

24       Q.   And what about access to service hours, did she

25    raise an issue about that?

17-2685  Miles v USD 500, et al  3.27.19  _Excerpt

1    A.   She did.  And, again, as best as I can recall

2    about that, she was concerned -- as I understand, when

3    you renew your teaching license, she might have needed

4    to get certain information from the district to do so.

5    And she was concerned about being able to get that if

6    she resigned and was no longer employed there.

7    Q.   And so if you flip to Exhibit 103, which is a

8    mutual release, Item 6, what's that entitled on the

9    second page?

10   A.   Item 6 is a clause that addresses return of

11   property and specifies that "the employee shall remove

12   her property and be able to get hers back."

13   Q.   And Item 7, what's that entitled?

14   A.   In-service credits.

15   Q.   And is that addressing the concerns you

16   understood she was raising as it related to a

17   resignation?

18   A.   It is.

19   Q.   I understand from your prior testimony and, of

20   course, Ms. Miles that on January 5th she came to our

21   offices; correct?

22   A.   That's right.

23   Q.   And met with you?

24   A.   Right.

25   Q.   And at that point did you provide her a copy of

1   the agreement?

2       A.   Yes.  I provided her a draft.

3       Q.   And did you tell her she had to sign it right

4   away?

5       A.   No.

6       Q.   What did you do?

7       A.   I presented it to her and told her she could look

8   it over and really offered her as much time as she

9   wanted to consider it and take a look at it.

10      Q.   And is there a point where you advised her she

11  should talk to a lawyer about it?

12      A.   She did have some questions that, seeing as I

13  represent the district, I couldn't answer.  And I think

14  she maybe mentioned whether she needed an attorney or

15  not, and I encouraged her to do so, and said she was

16  certainly welcome to do so if that's what she wanted to

17  do.

18      Q.   Did you prevent her from taking a copy of that

19  agreement with her when she left?

20      A.   No, I believe she did take a copy.

21      Q.   Do you -- did you tell her she had to sign it

22  before she left?

23      A.   No.

24      Q.   Did you tell her not to talk to a lawyer?

25      A.   No.

1    Q.   Once she left with the agreement to talk to an
2 attorney, tell me what happened next.
3    A.   Some time later that day I got a call from her
4 and she told me that she had talked to an attorney, and
5 she requested a specific change to the agreement, which
6 I think ended up in Section 12, that she -- she was
7 asking that the district wouldn't oppose any
8 unemployment.
9    Q.   And so if we look at the final version that got
10 signed -- or Exhibit 103, Item 12 is entitled
11 Unemployment Benefits?
12    A.   That's right.
13    Q.   And it indicates that the district won't oppose
14 an application for unemployment?
15    A.   That's correct.
16    Q.   And that was a suggestion made at the behest of
17 Ms. Miles?
18    A.   Yes.
19    Q.   And that's a change the district agreed to and
20 you incorporated in the agreement?
21    A.   That's right.
22    Q.   And then did you send the revised agreement to
23 her by e-mail?
24    A.   I did.  Once that change was made, I sent it to
25 her the next day.

1    Q.   And that was on January 6th?

2    A.   Yes.

3    Q.   And I think we looked at that as Exhibit 2, which

4    got admitted; is that right?

5    A.   I believe so.

6    Q.   Well, you're not going to find Exhibit 2 in

7    there.  Here, let's look at it real quick.  Let's see

8    here.  Here we got your e-mail from January 6th at

9    11:51; correct?

10   A.   That's correct.

11   Q.   Explaining you added the provision on

12   unemployment?

13   A.   Yes.

14   Q.   And it looks like you made the same mistake that

15   I make from time to time and may have forgotten to

16   include the attachment?

17   A.   That's right, I did.

18   Q.   Did you give Ms. Miles a specific deadline on how

19   long she had to review the agreement?

20   A.   No, I didn't.

21   Q.   And she came back into our offices on January

22   9th; is that right?

23   A.   That's right.

24   Q.   And you were there with her?

25   A.   Yes.

1    Q.  And did she sign the agreement?

2    A.  She did.

3    Q.  There was testimony from Ms. Miles that during

4  that January 9th meeting she said to you, "I guess I

5  have to trust what you say."  Did that happen?

6    A.  I don't remember her saying that.

7    Q.  There was testimony that she said to you, "I

8  don't have any choice," referring to signing the

9  agreement.  Did she say that to you?

10    A.  I don't recall her stating that explicitly.

11    Q.  You understand that Ms. Miles is claiming fraud

12  in connection with the execution of this agreement?

13    A.  I do.

14    Q.  Did you make any untrue statements to her?

15    A.  No.

16    Q.  Did you do anything to mislead her?

17    A.  No.

18    Q.  Did you lie to her?

19    A.  No.

20    Q.  You understand Ms. Miles is claiming duress in

21  connection with the execution of this agreement?

22    A.  I do.

23    Q.  Did you threaten her?

24    A.  No.

25    Q.  Do you think she had an opportunity to review the

1   entire agreement?

2       A.  I do.

3       Q.  Did she have an opportunity to leave with a draft

4   of the agreement before she signed it?

5       A.  Yes.

6       Q.  Did she have an opportunity to consult with an

7   attorney?

8       A.  I understand that she did, yes.

9       Q.  Did she ask changes to be made in the agreement?

10      A.  Yes.

11      Q.  And those changes were made?

12      A.  They were.

13          MR. BOWLES:  That's all I have.

14          THE COURT:  Any redirect for the witness?

15          MR. STIPETICH:  No, Your Honor.

16          THE COURT:  I do have a question.  I just want to

17  be sure I understand here, Mr. Turner.  When you sent --

18  I think you have it in front of you as Exhibit 102.

19  This is the e-mail to Ms. Cossairt.  Do you see it?

20          THE WITNESS:  Yes.

21          THE COURT:  And so you talk about forwarding the

22  matter to the district attorney for handling if not

23  resolved.  And so the matter that you reference there,

24  was that the overpayment situation?

25          THE WITNESS:  Yes and the lack of -- the lack of

1  repayment of that amount once Ms. Miles had been

2  notified that it was indeed an overpayment.

3       THE COURT:  I understand that it's up to the

4  district attorney or some other prosecutorial authority

5  to decide whether a crime may have been committed or

6  should be charged.  Obviously something was in your mind

7  as a possible crime.  What was it?

8       THE WITNESS:  We -- and, again, I can't recall

9  the specific statute necessarily --

10      THE COURT:  And I'm not looking for the

11 technical.  I'm just trying to understand what -- even

12 in the English language terms what you thought the

13 criminal activity consisted of.

14      THE WITNESS:  We thought that the -- the failure

15 to repay within the deadlines provided once Ms. Miles

16 had been informed that it was an overpayment and money

17 that she was not entitled to in light of it's a school

18 district so it's public funds, and the district has

19 certain obligations as a steward of those.  So our

20 thought was, again, for the district attorney's

21 determination is that could constitute a crime where she

22 refused to repay.

23      THE COURT:  All right.  Any questions based on my

24 questions to the witness?

25      MR. STIPETICH:  No, Your Honor.

1          THE COURT:  From the defense table?

2          MR. BOWLES:  No, Your Honor.

3          THE COURT:  All right.  Sir, you may step down.

4     Thank you.

5          (End of requested excerpt.)

6

7

8                         CERTIFICATE

9          I certify that the foregoing is a correct

10    transcript from the record of proceedings in the

11    above-entitled matter.

12       DATE:  April 4, 2019

13
                         /s/Kimberly R. Greiner
14                       KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                         United States Court Reporter
15

16

17

18

19

20

21

22

23

24

25