SUSAN M. MILES,

       Plaintiff,

v.

UNIFIED SCHOOL DISTRICT NO.
500, KANSAS CITY, KANSAS, and
VALERIE CASTILLO,

       Defendants.

Case No. 17-2685-DDC-TJJ

## MEMORANDUM AND ORDER

This case concerns whether a separation agreement and mutual release signed by plaintiff Susan M. Miles and defendant Unified School District No. 500, Kansas City, Kansas ("the District"), operates as a complete defense to plaintiff's claims against the District and defendant Valerie Castillo.

Ms. Miles is a former teacher in one of the District's schools. Her Complaint asserts employment claims against the District and defendant Valerie Castillo under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213; Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654; and Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. Doc. 1 at 8–15. Ms. Miles's Complaint also asserts a retaliatory discharge claim under Kansas common law. *Id.* at 12–13.

On June 21, 2018, the District filed a Motion for Temporary Restraining Order/Injunction and Stay of Proceedings. Doc. 20. The District's motion asserts that Ms. Miles released all of her employment claims when she signed a separation agreement and mutual release ("the Agreement"). The court—after conferring with the parties—concluded the enforceability of the

Agreement was a threshold issue warranting partial discovery, a separate trial, and a stay of all other case proceedings. Doc. 46 at 2.

On March 27, 2019, the court conducted a bench trial on the issue. Doc. 59. And, on April 5, 2019, the parties submitted their proposed findings of fact and conclusions of law. Docs. 61–62. The court, Ms. Miles contends, should not enforce the Agreement because she did not enter into the Agreement knowingly and voluntarily due to fraud, duress, and lack of mental capacity. Also, she argues that—under the totality of the circumstances—she did not waive her federal employment claims. After reviewing the evidence presented at trial and the parties' filings, the court concludes Ms. Miles and the District entered into an enforceable Agreement.

## I.      Legal Standard

"In an action tried on the facts without a jury . . . , the court must find the facts specifically and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). While this rule "does not require inordinately detailed findings," the court must provide enough detail to "indicate the factual basis for the ultimate conclusion." *Colo. Flying Acad., Inc. v. United States*, 724 F.2d 871, 878 (10th Cir. 1984) (quoting *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422 (1943)); *see also OCI Wyo., L.P. v. PacifiCorp*, 479 F.3d 1199, 1204–05 (10th Cir. 2007) (holding that a district court failed to satisfy its duty under Rule 52(a) to set out facts supporting its verdict).

## II.     Findings of Facts

Ms. Miles is a former teacher for the District. On April 8, 2017, Ms. Miles fell at work. She suffered numerous injuries, including post-concussive syndrome and occipital neuralgia. Ms. Miles hired attorney Kathleen Cossairt and filed a worker's compensation claim against the

District.  And, Ms. Miles received medical treatment from the District's worker's compensation health care provider through April 2017.

From August 9, 2016, to November 2, 2016, Ms. Miles was on FMLA leave.  As part of her worker's compensation claim, Ms. Miles began receiving Temporary Total Disability ("TDD") benefits from the District in October 2016.  But, before Ms. Miles received any TDD benefits, she received four paychecks from the District.  Ms. Miles suspected—from the first payment on August 15, 2016—that the payments were made in error because FMLA leave is unpaid.  On August 23, 2016, Ms. Miles sent an email to Ms. Cossairt stating, "I'm almost sure the paycheck I got on August 15 was in error.  Not sure how to proceed from here."  Pl.'s Ex. 23 at 2.  On August 25, 2016, Ms. Miles sent an email to Jania Motley, a District employee. Ms. Miles explained that she had received a paycheck covering the August 1–15, 2016, pay period.  Ms. Miles wondered if the payment was correct, or, if paid in error, how the error would be corrected.  Pl.'s Ex. 26.  Ms. Miles then used the funds paid by the District to pay her bills and living expenses.

On October 26, 2016, Fred Greenbaum—an attorney for the District—sent Ms. Cossairt a letter.  The letter stated:

> Please be advised your client received her full salary while she was not working and receiving temporary total disability benefits for pay periods of August 15, August 31, September 15, and September 30, 2016.  The payments were $2,419.67, which totals $9,678.68.  We will need to receive credit for the payments if and when we resolve this matter.  Please feel free to contact me with any questions.

Pl.'s Ex. 25 at 1.

On October 31, 2016, Ms. Cossairt responded to Mr. Greenbaum in an email. Ms. Cossairt stated,

> I have reviewed your letter dated 10-26-16 regarding the school district's overpayment of wages. I only represent Ms. Miles in her workers compensation case and this is related to other employer/employee legal issues. Please advise your client that ***Ms. Miles is not represented by me in any other matters other than her work comp case.*** Evidently, they are refusing to discuss this matter and other employer/employee issues with her directly, such as insurance coverage due to being informed of my representation. This is not the case.

Def.'s Ex. 100.

On November 16, 2016, Greg Goheen—another lawyer representing the District—sent Ms. Miles a demand letter. After explaining that Ms. Miles had received an overpayment of $9,678.68, Mr. Goheen requested payment within 10 days. Def.'s Ex. 101. Mr. Goheen wrote, "Should you fail to pay the above amount, a recommendation for termination of your teaching contract will be made and legal proceedings may be initiated against you." *Id.*

Ms. Cossairt spoke with Mr. Goheen on November 21, 2016, about the demand letter. Ms. Cossairt informed Ms. Miles that, "Mr. Goheen is considering our call a timely response." Ms. Cossairt then told Ms. Miles that Mr. Goheen had extended the deadline to December 30, 2016, to repay the $9,678.68. At trial, Mr. Goheen testified that the deadline was important to the District because of quarterly tax implications.

In late November 2016, Ms. Miles applied for a loan to repay the District. A month later, on December 15 and 22, 2016, Ms. Cossairt sent emails to Mr. Goheen and Mr. Greenbaum. Ms. Cossairt informed them that Ms. Miles was in the process of securing a loan.

On December 28, 2016, Ms. Cossairt spoke with Robert Turner, a third lawyer who represented the District. This same day, Ms. Cossairt responded in an email to Mr. Turner and Mr. Goheen stating, "I tried calling and emailing my client with no response. Please contact me after the first of the year to get this matter resolved." Def.'s Ex. 105 at 3.

Mr. Turner responded to Ms. Cossairt. Mr. Turner wrote,

> As I explained, the district will be forced to forward this matter to the District Attorney for handling if not resolved, as they have always done and continue to do in this type of situation. The timeframe for doing so falls at the end of this year, and there is no guarantee the district will be able to defer referral of the matter to the District Attorney once the new year rolls around.
>
> As stated in [Mr. Goheen's] previous demand letter, Ms. Miles'[s] continued failure to pay this amount could also result in recommendation for termination of her teaching contract.
>
> In an effort to get this resolved prior to the end of the year, the district would consider some form of repayment plan with a tender of her resignation from her position and release. This offer remains until the end of the year, but after that point we may have to revisit.

Def.'s Ex. 102.

Ms. Miles did not repay the loan by December 30, 2016. At trial, Mr. Goheen testified that the District believed plaintiff had violated Kan. Stat. Ann. § 21-5802, a criminal statutory provision for theft of property lost, mislaid or delivered by mistake, because the District did not know if or when Ms. Miles would refund the overpayment.

Around January 3, 2017, Ms. Miles called Mr. Turner. Ms. Miles testified that Mr. Turner told her she was being terminated. In his testimony, Mr. Turner disagreed. Namely, Mr. Turner contends that he told Ms. Miles that she couldn't return to work due to the outstanding repayment issue. Doc. 60 at 60 (Trial Tr. 60:10-22). And, Mr. Turner asserts that he offered Ms. Miles the resignation and release plan he had offered previously in his December 28 email. On January 3, 2017, Ms. Cossairt responded to Mr. Turner:

> Just spoke with Susan [Miles] and she will be hiring an employment attorney-probably Rick Guinn-to handle this due to your threats of turning over to the DA and request for her resignation. She notified the District when these payments came that she was on work comp and has cooperated in trying to resolve this. I have spent time trying to get this resolved and now am only representing her in the work comp case.

Def.'s Ex. 105 at 1. Ms. Miles did not hire Mr. Guinn or any other employment attorney.

Around January 5, 2017, Ms. Miles met with Mr. Turner at the law offices of McAnany, Van Cleve & Phillips ("MVP").  During this meeting, Ms. Miles delivered a cashier's check for $9,678.68—the full amount claimed by the District.  Mr. Turner provided the agreement proposed by the District and left the room.  Ms. Miles reviewed the agreement.  She found Mr. Turner and told him she did not feel comfortable signing the release.  Mr. Turner suggested Ms. Miles speak with a lawyer.  Ms. Miles did just that—she took the agreement to Ms. Cossairt, who looked over the agreement.  Ms. Cossairt suggested adding a "worker's compensation release clause," which Ms. Miles proposed to Mr. Turner.  Mr. Turner agreed to this modification.  And, Mr. Turner sent Ms. Miles an email with the revised agreement and wrote, "If agreeable, please sign and return the original agreement to me as soon as possible."  Pl.'s Ex. 2 at 1.

Around January 9, 2017, Ms. Miles returned to Mr. Turner's office.  Mr. Turner gave Ms. Miles a revised agreement, which included the "worker's compensation release clause" suggested by Ms. Cossairt.  Ms. Miles testified that she signed the Agreement because of the District's threat to turn the matter over to the District Attorney.  Doc. 60 at 26 (Trial Tr. 26:12–23).  Specifically, Ms. Miles asserted that she was concerned she would lose her teaching license.  *Id.* (Trial Tr. 26:12–16).  Ms. Miles described the situation as "traumatic" and "scary." *Id.* (Trial Tr. 26:21–23).

## III.  Discussion

"Where contracting parties have carried out negotiations and have subsequently entered into an agreement in writing with respect to the subject matter covered by such negotiations, the written agreement constitutes the contract between them and determines their rights."  *Albers v.*

*Nelson*, 809 P.2d 1194, 1197 (Kan. 1991) (citations omitted).[1]  Thus, "a party who signs a

written contract is bound by its provisions regardless of the failure to read or understand the

terms, unless the contract was entered into through fraud, undue influence, or mutual mistake."

*Id.* (citations omitted).

### A.    Fraud

First, Ms. Miles contends that the Agreement may be set aside because of fraud.[2]  Under

Kansas law, this argument means Ms. Miles must show an "untrue statement of fact, known to

be untrue by the party making it, which is made with the intent to deceive or recklessly made

with disregard for the truth, where another party justifiably relies on the statement and acts to his

or her injury and damage."  *Albers*, 809 P.2d at 1198 (citing *Nordstrom v. Miller*, 605 P.2d 545,

551–52 (Kan. 1980)).  "A fact is material if it is one to which a reasonable person would attach

importance in determining his choice of action in the transaction involved."  *Timi v. Prescott*

*State Bank*, 553 P.2d 315, 325 (Kan. 1976) (citation omitted).  Ms. Miles must establish the

elements of fraud by clear and convincing evidence.  *Monarch Normandy Square Partners v.*

---

[1]    Because settlement agreements are contracts, state contract law governs issues of formation, construction, and enforceability.  *United States v. McCall*, 235 F.3d 1211, 1215 (10th Cir. 2000).  Under Kansas law, "'the law of the forum applies unless it is expressly shown that a different law governs, and in case of doubt, the law of the forum is preferred.'"  *Mendy v. AAA Ins.*, No. 17-2322-DDC-GLR, 2017 WL 4422648, at \*6 (D. Kan. Oct. 5, 2017) (quoting *Brenner v. Oppenheimer & Co.*, 44 P.3d 364, 376 (Kan. 2002)) (further citation omitted).  Here, the parties agree Kansas law applies to the settlement agreement.

[2]    The court addresses two arguments—one evidentiary and one procedural—raised by defendants.  First, defendants assert, plaintiff only may use parol evidence to support fraud as an affirmative defense.  But the parol evidence rule does not prevent the court from considering evidence of duress.  *See Shook v. Puritan Mfg. Co.*, 89 P. 653, 654 (Kan. 1907) (parol evidence rule does not apply where written instrument is procured by fraud or duress (citation omitted)).

Defendants also assert that plaintiff failed to plead fraud and duress with sufficient particularity in her Complaint.  Doc. 61 at 10.  But, plaintiff raised these affirmative defenses in its Answer to defendants' counterclaims for breach of contract, specific performance, and declaratory and injunctive relief.  Doc. 19 at 18–25 (Def.'s Answer and Countercls. ¶¶ 1–40); Doc. 24 at 7 (Pl.'s Answer ¶¶ 6, 7, 8).  And, plaintiff's Answer included Ms. Miles's affidavit setting forth the basis for her fraud and duress affirmative defenses.  The court thus finds defendants' argument on this score unpersuasive.

*Normandy Square Assocs. Ltd. P'ship*, 817 F. Supp. 908, 918 (D. Kan. 1993) (citing *Tetuan v. A.H. Robins Co.*, 738 P.2d 1210, 1226 (Kan. 1987)). "The existence of fraud is normally a question of fact." *Alires v. McGehee*, 85 P.3d 1191, 1195 (Kan. 2004) (citation omitted).

Analogous claims also arise under Fourteenth Amendment due process claim when an employee asserts her resignation was involuntary. *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995); *Cacy v. City of Chickasha*, 124 F.3d 216 (10th Cir. 1997) (Table). As the Eleventh Circuit has explained, an employee's resignation is involuntary—and, thus, deprives the employee of due process—"where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee." *Id.* (internal citations omitted). "A misrepresentation may be material if it concerns an alternative to resignation, such as the possibility of criminal prosecution." *Id.* at 1570. But, threating criminal prosecution is a misrepresentation only "where the employer actually lacked good cause to believe that grounds for the termination and the criminal charges existed." *Id.* at 1568. The court finds this good cause standard helpful in considering whether, under Kansas law, Mr. Turner knew his statements were untrue when he made them.

Ms. Miles attributes two untrue statements of material fact to defendants, both involving Mr. Turner. Namely, she relies on Mr. Turner's email statement that the District would be "forced to forward the matter to the District Attorney," Def.'s Ex. 102 at 1, and Mr. Turner's statement on January 3, 2017, that the District "would talk to the district attorney and have charges filed against [Ms. Miles]" if she did not resign.[3] Pl.'s Ex. 29 at 4. But, Ms. Miles has failed to establish—by clear and convincing evidence—that Mr. Turner knew his statements were untrue.

---

[3] Ms. Miles does not argue that any other attorney for the District—*e.g.*, Mr. Goheen or Mr. Greenbaum— made an untrue statement to her. *See* Doc. 62 at 10–11.

First, Mr. Turner believed the District would forward the matter to the District Attorney if the overpayment issue was not resolved by December 30, 2016. Mr. Goheen had provided Ms. Miles with the December 30 deadline. And, Mr. Turner testified that the District had followed this procedure—*i.e.*, referring the matter to the District Attorney—in earlier situations where an employee refused to return overpaid funds. Ms. Miles thus has not shown that Mr. Turner knew his statement was false when he wrote it on December 28, 2016.

Second, Mr. Turner purportedly told Ms. Miles the District "would talk to the district attorney and have charges filed against [Ms. Miles]." The issue is whether Mr. Turner had good cause to believe that grounds for criminal charges existed—*i.e.*, did Mr. Turner know his statement was untrue? At the time Mr. Turner made this statement—January 3, 2017—Ms. Miles had not yet paid the overpayment back to the District, and Ms. Miles had missed the December 30, 2016, deadline. Mr. Turner believed that continued refusal to repay the money constituted a crime under Kansas law. Specifically, the District identified Kan. Stat. Ann. § 21-5802, a criminal statutory provision for theft of property lost, mislaid or delivered by mistake. In short, while the overpayment remained outstanding, the court concludes that Ms. Miles has not established by clear and convincing evidence that Mr. Turner misrepresented the possibility of criminal charges on January 3, 2017.

### B.     Duress

Ms. Miles asserts she signed the Agreement under duress. Ms. Miles bases her duress argument on Mr. Turner's purported threats discussed above. Forwarding the matter to the District Attorney served as a threat to institute criminal prosecution. And, under Kansas law, threat of criminal prosecution may amount to duress. *Ross v. Wal-Mart Stores, Inc.*, 730 F. Supp. 357, 359–60 (D. Kan. 1990) (citing *Motor Equip. Co. v. McLaughlin*, 133 P.2d 149, 154

(Kan. 1943)). Although the District focused on the potential criminal statute Ms. Miles

purportedly violated—Kan. Stat. Ann. § 21-5802—Kansas courts do not focus on "whether there

was ground for the threatened arrest or imprisonment," but instead on "whether the party

threatened was, by such threats, deprived of the exercise of [her] free will." *McLaughlin*, 133

P.2d at 155. Put another way,

> Under the law of Kansas, a threat of criminal prosecution does not
> constitute duress and will not defeat a contract unless the person to
> whom the threat was made became so frightened or was placed in
> such fear as to overcome her judgment and make it impossible for
> [her] to exercise [her] own free will.

*Gill v. Reveley*, 132 F.2d 975, 978 (10th Cir. 1943) (applying Kansas law). Duress, however,

cannot invalidate a transaction, "*notwithstanding any threats which may have been made*, where

the party had and took an opportunity for reflection and for making up [her] mind, and where

[she] consulted with others and had the benefit of their advice, especially where [she] was

advised by counsel." *Hastain v. Greenbaum*, 470 P.2d 741, 748 (Kan. 1970) (quoting 1 *Black on

Rescission and Cancellation*, 2d ed., § 223 at 630–31). "Generally, absent a confidential or

fiduciary relationship between the parties, one who asserts duress to avoid an agreement has the

burden of proof to establish that claim and such evidence must be of a substantial nature." *Libel

v. Libel*, 616 P.2d 306, 308 (Kan. Ct. App. 1980) (internal citations omitted).

Ms. Miles adduced evidence at trial that Mr. Turner made two threats of criminal

prosecution. First, on December 28, 2016, Mr. Turner wrote in an email to Ms. Cossairt that "As

I explained, the district will be forced to forward this matter to the District Attorney for handling

if not resolved[.]" Def.'s Ex. 102 at 1. And, during a phone call on January 3, 3017, Mr. Turner

purportedly told Ms. Miles that "criminal charges would be filed" against her if Ms. Miles did

not accept the resignation.

On January 9, 2017, when she was presented with the revised agreement, Ms. Miles's affidavit states, "At this point, feeling I had no other option but to sign the agreement as I would otherwise face criminal charges, I signed the agreement." Pl.'s Ex. 29 at 4. At trial, Ms. Miles described the situation as "traumatic" and "scary." Doc. 60 at 26 (Trial Tr. 26:21–23). But, even in light of Ms. Miles's testimony, the court does not find duress because other evidence adduced at trial demonstrated that Ms. Miles had an opportunity to (1) reflect and (2) seek counsel and bargain for terms.

First, after Mr. Turner's purported threat, Ms. Miles visited the MVP law offices the next day. Mr. Turner presented Ms. Miles with the Agreement. Had Mr. Turner's threat deprived Ms. Miles of her exercise of free will, one would have expected Ms. Miles to sign the agreement immediately. *See Gill v. Reveley*, 132 F.2d 975, 978 (10th Cir. 1943) ("Under the law of Kansas, a threat of criminal prosecution does not constitute duress and will not defeat a contract unless the person to whom the threat was made became so frightened or was placed in such fear as to overcome his judgment and make it impossible for him to exercise his own free will."). Ms. Miles exercised her free will because she did not sign the Agreement on January 5, 2017. Instead, "she did not feel comfortable signing the agreement." Pl.'s Ex. 29 at 4. Ms. Miles located Mr. Turner and told him that she didn't know what she was seeing. *Id.* In context, this testimony explained Ms. Miles's concern that she didn't understand all of the terms of the proposed agreement. Mr. Turner suggested Ms. Miles take the Agreement to her lawyer for review. *Id.*

Second, Ms. Miles had the opportunity to consult with her attorney about the Agreement and bargain for terms. Indeed, she did both. *Cf. Ross*, 730 F. Supp. at 360 (concluding plaintiff's duress defense would go to jury when plaintiff had neither time to reflect nor the

opportunity to confer with an attorney when signing release after repeated threats of criminal arrest).  Ms. Miles took the Agreement to her lawyer, Ms. Cossairt.  Ms. Cossairt reviewed the Agreement and suggested that Ms. Miles add a "worker's compensation release clause" to the Agreement.  Ms. Miles then contacted Mr. Turner about adding the clause, and Mr. Turner agreed.  Mr. Turner sent Ms. Miles the revised Agreement, which included the new clause Ms. Miles had requested, and instructed her, "If agreeable, please sign and return the original agreement to me as soon as possible."  Pl.'s Ex. 2.

In sum, Ms. Miles has not shown by substantial evidence that her will to contract was overcome by the threat.  Ms. Miles had an opportunity to seek counsel and utilized it.  And consultation with her lawyer led her to bargain for a new term in her agreement.  Last, the time to sign the agreement remained open ended.  Ms. Miles thus has failed to establish duress.

### C.  Mental Capacity

Next, Ms. Miles contends that she lacked the requisite mental capacity to form a contract on January 9, 2017.  Ms. Miles argues that she had difficulty reading under normal conditions such that she could not effectively read and understand the Agreement.  The District, in response, contends that Ms. Miles failed to meet her burden of proof because she adduced no expert witness testimony about her lack of mental capacity.

The District has the better end of this argument.  Whether a party has the requisite mental capacity to contract is a question of fact.  *DeBauge Bros. v. Whitsitt*, 512 P.2d 487, 490 (Kan. 1973).  "The test of mental capacity to contract is whether the person possesses sufficient mind to understand in a reasonable manner the nature and effect of the act in which [she] is engaged."  *Id.* (citing *Mills v. Shepherd*, 157 P.2d 533 (Kan. 1945)).  A party may not rely on conclusory allegations that he or she lacked capacity to contract; instead, the party must provide competent

medical evidence before the court from which a factfinder could conclude the party, on the day she signed the agreement, did in fact lack mental capacity. *DeClue v. Gen. Motors Corp.*, No. 99-2229-JWL, 2000 WL 1472856, at *3 (D. Kan. Aug. 22, 2000).

Ms. Miles's lone assertion about her capacity argues that she had trouble reading under normal conditions and did not read and understand the Agreement effectively. But, Ms. Miles has adduced no other evidence for the court to conclude she lacked the mental capacity to form a contract. *See id.* (rejecting plaintiff's capacity defense when the only evidence was plaintiff's affidavit that concluded "plaintiff failed to understand the nature and effect of the settlement agreement because of her medication and because of other stressors in her life"). The court thus concludes that Ms. Miles has not met her burden to establish a lack of mental capacity.

### D. Totality of the Circumstances

Last, Ms. Miles contends that, under the totality of the circumstances, her waiver of federal remedial rights was not knowing and voluntary. The Tenth Circuit looks beyond the contract language and considers all relevant factors when analyzing a plaintiff's knowledge and the voluntariness of an agreement waiving federal employment rights. *Torrez v. Pub. Serv. Co. of N.M.*, 908 F.2d 687, 689 (10th Cir. 1990); *see also Poppelreiter v. Straub Int'l, Inc.*, No. 99-4122-SAC, 2001 WL 1464788, at *4 (D. Kan. Oct. 30, 2001) (concluding waiver claims under federal laws, such as Title VII, ADA, and FMLA claims must be knowing and voluntary under the *Torrez* factors). Ms. Miles's Complaint raises claims under the ADA, FMLA, and ERISA. The court thus considers the following:

> (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether [p]laintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an

> opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

*Id.* at 689–90 (quoting *Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 451 (3d Cir. 1988)). Last, the burden of proof rests with the District. *Poppelreiter*, 2001 WL 1464788, at *5 (citations omitted).

Many of the factors considered in previous sections of this Order apply here and many of them suggest that Ms. Miles made a knowing and voluntary waiver of her claims. First, plaintiff took the proposed agreement with her from Mr. Turner's office to consider. Ms. Miles could sign and return the release if she found it agreeable. The District thus imposed no time limit on Ms. Miles's acceptance. Mr. Turner encouraged Ms. Miles to seek advice from her attorney, Ms. Cossairt.[4] And, Ms. Miles actually took the proposed agreement to Ms. Cossairt. With Ms. Cossairt's advice, Ms. Miles negotiated for a revision to the agreement where the District agreed not to oppose Ms. Miles's unemployment benefits. In addition, the Agreement specifically mentions waiver of employment discrimination claims, including those available under Title VII, the Civil Rights Act, the Americans with Disabilities Act, and the American with Disabilities Act. Def.'s Ex. 103 at 2. Taken together these factors favor a finding that Ms. Miles signed a knowing and voluntary waiver of her federal remedies.

The court is without evidence to assess whether the consideration given in exchange for Ms. Miles's waiver exceeded the benefits she already was entitled to by contract or law. Ms.

---

[4] At times during her testimony, Ms. Miles's frustration appeared directed at her attorney, Ms. Cossairt. Namely, in October 2016, Ms. Cossairt had represented to the District's attorneys that she only was handling Ms. Miles's worker's compensation case. But, in later communications between Ms. Cossairt and the District's attorneys, Ms. Cossairt negotiated wage repayment issues, including exchanging communications with Mr. Turner on December 28, 2016. While Ms. Miles may dispute the scope of Ms. Cossairt's representation, that dispute—if it exists—isn't before the court.

Miles explained, however, that her disability made it difficult for her to read the release and understand its terms. But, as discussed, Ms. Miles's opportunity to consult with counsel undercuts this argument.

On balance, the court concludes, after applying the *Torrez* factors, Ms. Miles's waiver of her federal employment claims was a knowing and voluntary one. Ms. Miles thus is bound by her agreement to waive her rights the specified federal employment laws.

## IV.    Conclusions of Law

The Agreement will not be set aside for reason of fraud, duress, lack of mental capacity, or under the totality of the circumstances test. The Agreement is an enforceable contract between Ms. Miles and the District.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the Agreement will not be set aside for reason of fraud, duress, lack of mental capacity or under the totality of the circumstances.

**IT IS FURTHER ORDERED THAT** the Agreement is an enforceable contract between Ms. Miles and the District.

**IT IS FURTHER ORDERED THAT** the court lifts the stay of case proceedings issued in its October 26, 2018, Order (Doc. 46). The court directs the parties to contact the Deputy Clerk at ksd_crabtree_chambers@ksd.uscourts.gov or (913) 907-1425 to schedule a status conference.

**IT IS SO ORDERED.**

**Dated this 16th day of August, 2019, at Kansas City, Kansas.**

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**